DOMUS REALTY CORPORATION, Plaintiff, *v.* 3440 REALTY CO., INC., et al., Defendants.*

Supreme Court, Special Term, New York County, February 9, 1943.

* Affd. 266 App. Div. 725.

*Burt Franklin* for plaintiff.

*Morway Picket* for 3440 Realty Co., Inc., defendant.

SHIENTAG, J. This is a motion by the plaintiff for summary judgment in a suit to foreclose a purchase money mortgage, in the principal sum of $16,000 covering premises 3440 Broadway, New York City. The suit is based upon a default in payment of quarterly instalments of interest in the sum of $153, and of principal amounting to $175, which became due on November 15, 1942. The bond and mortgage provided a grace period of ten days within which payment might be made. On November 30, 1942, the defendant remitted its check in the sum of $175 in payment of principal and on December 3, 1942, defendant sent its check for $328 in payment of principal and interest, both of which the mortgagee refused to accept. Thus the default complained of, taking into account the grace period, was five days as to principal and eight days as to interest.

For this default, the mortgagee elected to declare the principal amount of the mortgage to be due; foreclosure proceedings were commenced on December 3, 1942, and a receiver of the property was appointed. The defendant asserts that its default was unintentional; that it was the result of a mistake as to the period of grace allowed in the bond and mortgage; that the mortgagee has in no way been prejudiced by the slight delay in paying the instalments due; that the conduct of the mortgagor under the circumstances of this case was so unconscionable, harsh and oppressive as to warrant a court of equity in refusing its active aid to accomplish the foreclosure sought.

In *Graf* v. *Hope Building Corp.* (254 N. Y. 1), decided in 1930, it was held by a divided court of four to three that a mortgagee was entitled to enforce an acceleration clause in the absence of fraud, bad faith or unconscionable conduct; that a mortgagee could strictly insist upon its contract rights and refuse a tender of interest which, as a result of errors and negligent omissions, was not made until the expiration of a twenty-day grace period. That case is marked by a strong dissenting opinion by Chief Judge CARDOZO, one of the few he wrote in the many years that he served on the highest court of our State. The dissent was concurred in by LEHMAN and KELLOGG, JJ. In *Ferlazzo* v. *Riley* (278 N. Y. 289, 292) decided in 1938, the Court of Appeals cited the *Graf* case in connection

with the following pronouncement: " We need only say that a mortgagor is bound by the terms of his contract as made and cannot be relieved from his default, if one exists, in the absence of waiver by the mortgagee, or estoppel, or bad faith, fraud, oppressive or unconscionable conduct on the latter's part."

It becomes necessary, therefore, to review in some detail the facts presented in the affidavits submitted in opposition to this motion in order to determine whether, if established at a trial, they would show such oppressive or unconscionable conduct on the part of the mortgagee as to warrant a court of equity in refusing to extend its active aid, at the behest of the party guilty of such conduct.

The opposing affidavit is made by Lee Ogden, a practicing physician, who is the president of the defendant 3440 Realty Company, the owner of the premises sought to be foreclosed. According to his affidavit, some time in June, 1941, one James Teitelbaum, who represented himself to be a real estate expert, persuaded Dr. Ogden to join a syndicate with him and two other men named Galkin and Unger. Not one of these three men had any real estate experience. Galkin formerly operated a small grocery store. Because of ill health and retiring years he was obliged to sell his business. He is now sixty-six years old and lives in Mount Vernon. Unger is a pensioned watchman of the city of New York, some seventy years of age. Dr. Ogden for the past thirty years has been a practicing physician, now living in Pelham Manor, with an office at 104 East 40th Street, New York City. He says that his practice keeps him busy " week in week out, from seven in the morning to ten at night."

According to the opposing affidavit, Teitelbaum selected the attorney for the defendant company; he had the contract drawn; he signed the contract. None of his associates was present at the signing of the contract of purchase dated July 17, 1941. The contract specified the purchase price to be $194,300. The property was to be taken subject to a first mortgage made by the Union Dime Savings Bank in the sum of $162,300. Two thousand dollars was paid on the signing of the contract, $14,000 was paid on the closing, and there was to be a twenty-year purchase money mortgage of $16,000, the mortgage involved in this foreclosure action.

On August 15, 1941, the title was closed. Neither Dr. Ogden nor Mr. Galkin attended the closing. Unger attended as a spectator only. The purchase money bond and mortgage were signed by Teitelbaum as president of the defendant company.

According to the opposing affidavit, in August of 1942, because of certain claimed derelictions, Teitelbaum was forced to resign from the company. Since neither Galkin nor Unger had any resources to make good the depleted assets of the defendant company to enable it to meet its obligations Dr. Ogden was obliged to make an additional investment.

The bond provides that the whole of the principal sum shall become due after default in payment of interest for ten days, or after default in payment of any tax, water rate or assessment for thirty days after it becomes a lien. The printed provision for a thirty-day grace period in payment of interest was changed in typewriting to ten days. The printed provision for a thirty-day grace in the payment of any tax or assessment after notice and demand was changed first in typewriting to ten days, then back again in handwriting to thirty days, and "after notice and demand" was changed in handwriting to "after same becomes a lien."

The mortgage provides that the whole of the principal sum shall become due after default in payment of any instalment of principal and/or of interest for ten days or after default in payment "of any tax, water rate or assessment for thirty days after same shall have become a lien." There were substantially similar alterations in this provision of the mortgage as have been mentioned in connection with the bond.

On August 15, 1942, the quarterly instalment of interest and principal then due to the plaintiff was paid. On November 2, 1942, real estate taxes were paid to the city of New York in the sum of $2,923.34 for the first half of the fiscal year 1942-1943; on November 9, 1942, the defendant paid the Union Dime Savings Bank, on its first mortgage, the instalment of principal and interest amounting to $2,026.75. In all, between November 2 and November 9, 1942, the defendant company paid $4,950.09 for taxes and for interest and principal on the first mortgage. In the year and a quarter that the defendant owned premises 3440 Broadway it reduced the first mortgage by $2,100. It reduced the twenty-year purchase money bond and mortgage held by the plaintiff by the sum of $700.

On October 27, 1942, the plaintiff says it sent a notice to the defendant addressed to 3440 Broadway advising it of the interest and instalment of principal due on November 15th. On November 23, 1942, a telegram was sent by plaintiff addressed to the defendant, at the same address, calling attention to the fact that the interest and instalment due November 15, 1942,

remained unpaid. On November 27, 1942, the plaintiff, by a letter addressed to the defendant, advised the latter that because of default in the payment of principal and interest plaintiff elected to declare the entire principal sum, then unpaid upon the mortgage, to be due and payable.

Dr. Ogden in his opposing affidavit states that neither he nor any of his associates in the company ever received the notice of October 27th; that on November 30, 1942, he received from the superintendent of the building at 3440 Broadway the telegram of November 23rd, and a letter of the same date enclosing a copy of the telegram, and the notice of election to declare the entire amount of the principal due dated November 27, 1942. Dr. Ogden states that he and Mr. Galkin had been ill just prior to November 30th and were not in any condition to attend to the affairs of the company; that Mr. Unger had at no time involved himself to any great extent in the business of the company. Dr. Ogden states that it was his understanding that his company had a thirty-day grace period in the purchase money bond and mortgage as they had in the first mortgage covering the premises, or " that in any event the defendant company had ten days after the time of notice from the plaintiff to make payment of the interest and principal instalment." It is evident that he was confused about the terms of the bond and mortgage. When, on November 30, 1942, he received the letter dated November 27th he was so astounded that he returned it to the plaintiff with this notation in his handwriting: " Gentlemen: There are eight vacancies in the house and three tenants left without payment ($525). It is *war time,* and your telegram and special deliveries are childish. Be patient." The reference to special deliveries would seem to be an error on the doctor's part. Nothing is said in affidavits in support of the motion about any letters sent by special delivery; there is a reference to one registered letter, dated November 27, 1942, which, because of the default, elected to declare the entire amount of the mortgage to be due and payable.

The summons in this case was dated December 1st, and the foreclosure proceedings commenced on December 3rd. The defendant owner was served on December 7th. A receiver was appointed on December 9th and is still in possession.

If the defendant were to obtain the relief it seeks at the hands of this court it would, of course, be obliged to pay the expenses incurred in connection with the foreclosure proceeding The important question for consideration is whether, if the facts

set forth in the opposing affidavit are established at a trial, there would be a good defense to the foreclosure action.

The default clearly was an inadvertent one based upon a misunderstanding by a doctor unversed in real estate matters. The plaintiff within a year and a half received almost $17,000 in cash paid to it by the defendant. Plaintiff was in no way prejudiced, so far as the papers on this motion indicate, by the slight delay in making the small quarterly payment of interest and instalment of principal, and this trivial default is entirely out of proportion to the harshness of the plaintiff's action in declaring the entire amount of the principal due under the acceleration clause, and depriving the defendant of the benefit of a mortgage that had almost nineteen years more to run.

I am of the opinion that if the facts set forth in the opposing affidavit are established at a trial they would constitute a good defense within the rule laid down in *Graf* v. *Hope Building Corp.* (*supra*), and *Ferlazzo* v. *Riley* (*supra*). They would show that the action of the plaintiff, under the circumstances of this case, was so oppressive and unconscionable as to warrant a court of equity in refusing to extend the affirmative aid sought by the plaintiff.

Throughout the history of our law it has always been the deep concern of equity to temper the wind to the shorn lamb. To that concern equity owes its origin; that same concern is manifest throughout the period of its growth and development. To equity a suitor came for relief against the merciless application of some of the rules of the common law. Early in the history of equity came the pronouncement from the Chancellor that he who seeks equity must do equity.

The *Graf* case was cited by the Court of Appeals in a later decision, *Ferlazza* v. *Riley* (*supra*), as holding that a mortgagor cannot be relieved from his default " in the absence of waiver by the mortgagee, or estoppel, or bad faith, fraud, oppressive or unconscionable conduct on the latter's part." The court, in its very language, does not limit relief to fraud, waiver, estoppel, or bad faith; it specifically holds that relief may also be afforded for " oppressive or unconscionable conduct " on the part of a mortgagee. " Oppressive or unconscionable conduct " were not mere passing words. They were intended to have meaning and purpose. Those words are not so much words of art as they are of popular usage and significance.

Tested by ordinary definition and by common understanding, " oppressive " means conduct that is unjustly burdensome,

harsh or merciless, and " unconscionable " means conduct that is monstrously harsh, that is shocking to the conscience. If the facts set forth in the opposing affidavit are established at a trial, they would certainly constitute " oppressive or unconscionable conduct on the part of a mortgagee " within the rule laid down by the Court of Appeals.

I hold therefore that the remedy of summary judgment, which is one in furtherance of justice, should be denied to the plaintiff, and that the defendant should have an opportunity of establishing the defense as set forth in its opposing affidavit at a trial. (*Ferlazzo* v. *Riley, supra.*)