191 N.J. Super. 53 (1983)
465 A.2d 547
HERITAGE BANK, N.A., PLAINTIFF,
v.
PATRICIA H. RUH, DEFENDANT.
Superior Court of New Jersey, Chancery Division Camden County.
Decided February 1, 1983.
*55 Edward Casel, for plaintiff.
John A. Jones, for defendant (Jones & Lutz, attorneys).
DEIGHAN, J.S.C.
This is an action to foreclose a mortgage insured by the Federal Housing Administration (FHA) and administered under the rules and regulations of the Department of Housing and Urban Development (HUD). Defendant contends that plaintiff failed to follow regulations and procedures as promulgated by HUD pertaining to foreclosure proceedings; she maintains that as a result she lost an opportunity to recast the mortgage, to obtain special forbearance relief and to have the mortgage assigned to the FHA.
On June 30, 1980 William E. Buehler and Elizabeth Buehler, his wife, and Patricia H. Ruh executed an FHA-insured bond and mortgage to Jefferson Mortgage Company (Jefferson) in the sum of $51,850, with interest at the rate of 11 1/2% payable in monthly installments, together with monthly payments towards mortgage insurance premiums, taxes and insurance. The total monthly payments amounted to $679. The mortgage covered property located at 1517 Haddonfield-Berlin Road, Cherry Hill, New Jersey, which had been owned by the Buehlers for about ten years. It was conveyed by the Buehlers to themselves and defendant, who moved into the property in July 1980. Within a few weeks the Buehlers conveyed the property to defendant for the total consideration of $52,900 and then moved to Somerdale, New Jersey. Defendant continued to occupy the premises and made monthly payments on August 1, September 1 and October 1, 1980. No payment has been made since October 1, 1980.
*56 The mortgage was executed to Jefferson but assigned to plaintiff bank on the same date and serviced by Jefferson for plaintiff. On July 1980 Jefferson addressed a letter to the Buehlers and defendant concerning the account number of the mortgage, monthly payments to principal and interest and the escrow account, the due date and late charges, with directions to make payments to Jefferson. The letter had defendant's name underneath the Buehlers' name and was not delivered to 1517 Haddonfield-Berlin Road but was forwarded by the Cherry Hill Postoffice to the Buehlers at 804 W. Somerdale Road, Somerdale. The Buehlers hand-delivered the letter to defendant. On January 19, 1981 a delinquency notice was addressed in the same manner and was again forwarded by the postoffice to the Buehlers, who again hand-delivered it to defendant.
On February 18, 1981 defendant met with James Smedley, president of Jefferson, whom she knew personally through her business as a real estate broker. Arrangements were made to pay $1,000 a month until the delinquency was brought current. On the same date she received a letter advising that the account had been approved for foreclosure. She contacted Smedley concerning the letter, who advised that he would stop the action but that she would be required to pay the $1,000 by the end of March. She apparently had another conversation with Smedley because she received another letter, dated February 26, 1981, advising that the total delinquency, including the payment due for March 1, amounted to $3,503.54. She made a notation on this: "$1,000 due a month start April 1." When defendant failed to make the first $1,000 due-a-month installment she again contacted Smedley for extra time, but was told that the mortgage was being transferred to plaintiff, who would contact her.
In the meantime, Jefferson went into bankruptcy and all of its files were taken over by mortgagees for whom it had been servicing the accounts. Plaintiff took over about 1,000 mortgage accounts for direct servicing and received defendant's file from Jefferson on March 19, 1981. In the second or third week *57 of April defendant called plaintiff. She did not know with whom she spoke but advised that she had no coupon book or account number. She was told that plaintiff was in the process of transferring the accounts and that they would contact her at a later date. Since the mortgage was four months in arrears when plaintiff took over servicing the account, the file was not sent to plaintiff's mortgage department nor programmed into a mortgage computer but rather was sent directly to plaintiff's foreclosure department.
In July 1981 plaintiff forwarded a tax bill for the second quarter of 1981 to defendant. The accompanying letter stated it could not identify the tax bill with her loan number and requested that if she had an active mortgage with plaintiff, to indicate the loan number and return it to plaintiff. She wrote to plaintiff on her real estate stationery and advised that she never received an account number. In July 1982 the tax bill for the second quarter of 1982 was forwarded to defendant by plaintiff, with the same inquiry as to her loan number. It is obvious that plaintiff's mortgage department was not communicating with its foreclosure department.
Foreclosure proceedings were instituted on November 9, 1981. Defendant was served on January 25, 1982. She filed a pro se answer and asserted as defenses, among other matters, that she had not been offerred any reinstatement of the mortgage; plaintiff never sent payment books, invoices for payments, or cards for payments or notice of any type; plaintiff never directed her to make payments to it at any location; she received no information that plaintiff is the mortgagee and that plaintiff never attempted to contact her by telephone or by mail.
In February 1982 she went to plaintiff's office and spoke to Vincent Campellone, who is in charge of the mortgage department. She seemed indignant because Campellone refused to permit her to go through plaintiff's file. She did see 8 to 12 envelopes in the file with yellow tickets on them, which indicated to her envelopes returned from the postoffice. Campellone *58 informed her of the amount of arrearages and advised that the mortgage would be reinstated if plaintiff paid all arrearages within two weeks. Defendant called him two or three times after that but was unable to speak with him. She went to plaintiff's office but Campellone would not see her.
Toward the end of February or the beginning of March 1982 defendant then made an appointment with Robert J. O'Shaugnessy, the foreclosure administrator, concerning the account. She was again informed that plaintiff required full payment to reinstate the mortgage. A meeting was then arranged among defendant, O'Shaugnessy and a representative of HUD. They explained to her that when the account was assigned to plaintiff it was already four months in arrears and therefore did not go to the mortgage department but went directly to the foreclosure department. On this occasion she again glanced at plaintiff's open file and this time noted that there were only two or three letters with the yellow stickers on them indicating nondelivery. At another meeting between O'Shaugnessy and the HUD representative she was informed by HUD that it rejected an assignment of the mortgage, based on copies of notices addressed to her in the original Jefferson file but which she never received. She was given a HUD Handbook and tried to pursue her HUD rights, but was refused based upon HUD's review of the information in the Jefferson file.
At trial defendant admitted that if given an opportunity, she was unable to bring the account current. Defendant's only source of income is her real estate business. Defendant said that she could have made payments of $1,000 a month from April 1 to September 1, 1981, but admitted that her total income for that year was only about $13,000. Obviously, defendant at no time since default has been financially able to cure the delinquency and reinstate the mortgage. Defendant could not make any payments in 1982.
Defendant contends that plaintiff failed to follow the regulations promulgated by HUD, 24 CFR 203,600 et seq., as authorized *59 by 12 U.S.C.A. § 1715b, and further, that plaintiff failed to follow the procedures outlined in the HUD Handbook, 4330.1 (formerly 4191.02), on Administration of Insured Home Mortgages. As previously noted, defendant originally contended she lost an opportunity to recast the mortgage, to obtain special forbearance relief, and to have the mortgage assigned to FHA. She has abandoned this position. She now maintains that the failure to follow the regulations and procedures in itself precludes plaintiff from foreclosing the mortgage, or alternatively, plaintiff's conduct in this respect is so unconscionable and inequitable as to preclude it from relief in equity. She relies upon Associated East Mortgage Co. v. Young, 163 N.J. Super. 315 (Ch.Div. 1978); Federal Nat'l Mortgage Ass'n v. Ricks, 83 Misc.2d 814, 372 N.Y.S.2d 485 (Sup.Ct. 1975), and Cross v. Federal National Mortgage Ass'n, 359 So.2d 464 (Fla.D.C. 1978).
Plaintiff contends that HUD regulations and procedures outlined in the Handbook are discretionary, not mandatory, and are not a legal prerequisite to foreclosure, which is controlled by state law. It relies upon Brown v. Lynn, 385 F. Supp. 986 (N.D.Ill.E.D. 1974) (Brown 1); Roberts v. Cameron-Brown, 556 F.2d 356 (5 Cir.1977); Hernandez v. Prudential Mtgs. Co., 553 F.2d 241 (1 Cir.1977), and Northrip v. Federal Nat' Mtge. Co., 527 F.2d 23 (6 Cir.1975). It denies that under state law it is guilty of any inequitable conduct precluding it from foreclosing the mortgage.
Initially, it is necessary to review the HUD regulations pertaining to foreclosure of FHA mortgages. The most succinct summary of these regulations is in 29 N.J.Practice (Cunningham and Tischler, Law of Mortgages), § 176 at 60 et seq. (Supp. 1981), which states:
When mortgages are FHA-insured, the current HUD Regulations require the mortgagee "to take prompt action to collect amounts due from mortgagors to minimize the number of accounts in a delinquent or default status," (24 CFR § 203,600) but the mortgagee "shall not commence foreclosure for a monetary *60 default unless at least three full monthly payments due on the mortgage are unpaid," except where "the mortgagee ascertains that (1) the mortgaged property is vacant or has been abandoned, (2) the mortgagor, after being clearly advised of the options available for relief, has clearly stated in writing that he has no intention of honoring his mortgage obligation, or (3) a tenant is paying rentals on the property but such rentals are not being applied to the mortgage payments." (24 CFR § 203.606). The mortgagee is directed to "give notice to each mortgagor in default on a form supplied ... or approved by the Secretary [of HUD], no later than the end of the second month of any delinquency in payments" (24 CFR § 203,602), and to initiate certain "contacts" with delinquent mortgagors before beginning foreclosure proceedings."[1]
The HUD Regulations also provide that "[t]he mortgagee shall permit reinstatement of a mortgage, even after the institution of foreclosure proceedings, if the mortgagor tenders in a lump sum all amounts required to bring the account current, including foreclosure costs and reasonable attorney's fees and expenses properly associated with the foreclosure action, unless (a) the mortgagee has accepted reinstatement after the institution of foreclosure proceedings within two years immediately preceding the commencement of the current foreclosure action, (b) reinstatement will preclude foreclosure following a subsequent default, or (c) reinstatement will adversely affect the priority of the mortgage lien." 24 CFR § 203.608 In addition, the HUD Regulations authorize "special forbearance relief" and "recasting" of the mortgage in certain cases.[2]
"Special forbearance relief" may be granted to a delinquent mortgagor without obtaining the approval of the Secretary of HUD if the mortgagor establishes to the satisfaction of the mortgagee (whose finding is conclusive) that the mortgagor *61 owns no other property subject to a HUD-insured mortgage and the written forbearance agreement (1) is limited to a period of 18 months, (2) provides for resumption of regular mortgage payments after expiration of the forbearance period, and (3) provides for repayment of the total unpaid indebtedness accruing prior to and during the forbearance period on or before a date extending the original maturity for a period no greater than the forbearance period. 24 CFR § 203.614(b). In other cases the mortgagee must obtain the approval of the Secretary, who may approve only if he finds that the default was due to circumstances beyond the mortgagor's control and the forbearance agreement provides for payment of the total unpaid indebtedness accruing prior to and during the forbearance period on or before the original maturity date or some date subsequent to the original maturity which is approved by the Secretary. 24 CFR § 203.614(a) Since the language as to "special forbearance relief" is permissive, it is clear that the mortgagee need not enter into such an agreement with the delinquent mortgagor, whether or not the Secretary's approval would be required in a particular case.[3] (Emphasis supplied).
The HUD Regulations also authorize the Secretary of HUD to approve the "recasting" of the mortgage so as to make "the total unpaid amount" payable "over the remaining term of the mortgage or over such longer period of time as the Secretary may approve," provided the Secretary finds that the default was due to circumstances beyond the mortgagor's control. 24 CFR § 203.616(a). The mortgagee is authorized to "recast" the mortgage without obtaining the Secretary's approval if the mortgagee finds that the mortgagor does not own any other property subject to a mortgage insured by HUD and the "recast" agreement requires payment of the entire unpaid indebtedness over the remaining term of the mortgage or a term extending nor more than ten years beyond the original maturity date, in which *62 case the Secretary is to be notified within 30 days of the execution of the "recast" agreement. 24 CFR 203.616(b). In any case however "[r]ecasting may be refused in the sole discretion of the mortgagee." 24 CFR § 203.616(c)[4] (Emphasis supplied).
It is clear that the granting of "special forbearance relief" or the "recasting" of the mortgage in accordance with HUD Regulations will not terminate the mortgagee's FHA insurance coverage. 24 CFR § 203.340, 203.342. Although there would otherwise appear to be an implication to the contrary when the mortgagee does not comply with the HUD Regulations as to "special forbearance relief" or "recasting" of the mortgage, the Regulations include an express statement that "[f]ailure to comply with the provisions of" the Regulations here considered "shall not be a basis for denial of insurance benefits but may be cause for withdrawal of a mortgagee's approval" as an FHA-insured mortgage lender. 24 CFR § 203.500[5]
Heretofore, 24 CFR § 203.500 specifically stated that the servicing regulations are not intended to affect the rights and obligations of the parties under the mortgage. On May 5, 1980 this section was amended as follows:
The Department takes no position on whether a mortgagee's refusal or failure to comply with section 203.652-662 is a legal defense to foreclosure; that is a matter to be determined by the courts.
The amendment further provides:
It is the intent of the Department that no mortgagee commences foreclosure or acquisition of the property until the requirements of §§ 203.650-203.662 or instructions issued pursuant to said sections have been complied with.
The amendment may seem contradictory. However, it is essential to distinguish between the program for the assignment of the mortgage to the Secretary of Housing and the foreclosure requirements. Section 203.650 of the Regulations referred to in § 203.500 is the section for assignment mortgages to the Secretary *63 of Housing. The HUD Handbook on Administration Of Insured Home Mortgages points out this distinction. Chapter 1, page 1 of the Handbook, 4330.1 (formerly 4191.1) states that:
The purpose of this Handbook is to provide procedural information and policy guidelines used by HUD-approved mortgages in this servicing of HUD-insured mortgages ... Failure of any mortgagee to satisfactorily service HUD-insured mortgages in accordance with the provisions of applicable Regulations may result in suspension or termination of the Lenders acceptability as a HUD-approved mortgagee. (See, 24 CFR 203.7(a)(7).
The Handbook then reiterates that amendment:
It is the intent of the Department that no mortgagee commences [sic] foreclosure or acquisition of the mortgage until the requirements of the assignment program have been met. [Ibid; emphasis supplied]
The Handbook then states that "the requirements and conditions of payment of insurance benefits are established by the National Housing Act and the Mortgage Insurance contract." Ibid; emphasis supplied. "[w]ith respect to foreclosure the requirements and conditions ... are established by the mortgage, contract and state law. ..." Ibid; emphasis supplied.
The Handbook then paraphrases the amendment to 24 CFR § 203.500:
HUD takes no position on whether a mortgagee's refusal or failure to comply with the assignment procedures is a legal defense to foreclosure, that is a matter to be determined by the courts. [Ibid; emphasis supplied]
The seminal case on the effect of a mortgagee's failure to follow HUD Regulations is Brown v. Lynn, 385 F. Supp. 986 (N.D.Ill.E.D. 1974) (Brown I); Brown v. Lynn, 392 F. Supp. 559 (N.D.Ill.E.D. 1975) (Brown II). This was an action by mortgagors on a mortgage insured under the National Housing Act, against mortgagees who had instituted foreclosure proceedings and representatives of HUD. Plaintiffs alleged that the mortgagees made no attempt during the delinquency period to ascertain the cause or status of plaintiff's financial plight. After a number of months of arrearage, despite plaintiff's interim efforts and payments, the mortgagees referred the matters to their attorneys for collection. 385 F. Supp. 989. The mortgagors argued that they had standing to enforce the regulatory scheme which requires the mortgagees to attempt to alleviate any *64 conditions which may jeopardize home ownership and that a prudent lending institution would pursue the activities as outlined in the HUD Guidebook. 385 F. Supp. at 990.
In rejecting both of these contentions the court observed:
The role of a prudent lending institution in the market place cannot be defined so narrowly as the plaintiffs suggest, but rather, the very nature of the mortgagees' business and financial relationship with their clients also requires prudence in protecting their own investments.... Accordingly, the ambiguous and multi-purpose concept of a prudent lending institution cannot be read to compel the mortgagees to seek alternatives to foreclosure where deficiencies in fact exist, and they have acted within the limits of the state foreclosure procedures. [Id., at 998]
As to the effect of the regulations the court held:
Nor may plaintiffs rely upon the other regulations to prevent alleged precipitous foreclosure by mortgagees. These regulations unfortunately are clearly expressed as alternatives which the mortgagees may turn to if they so choose. They are not obligatory directives. By virtue of the permissive language present in each regulation, the defendant mortgagees are not compelled to follow these measures in lieu of foreclosure. [Ibid.]
The court concluded:
The guidelines in their present form, therefore, cannot be used to require the mortgagees to pursue the alternatives listed therein, and, accordingly, do not give rise to a claim of a duty owed or a remedy. [Ibid.]
Brown v. Lynn was followed an approved in Encarnacion Hernandes v. Prudential Mortgage Corp., 553 F.2d 241 (1 Cir.1977), where the court, after quoting Brown v. Lynn, stated:
This is a reasonable interpretation of the handbook and of the regulations and laws that the handbook implements. In a closely analogous case, the Supreme Court was faced with difficulty differing interpretations of a HUD circular. The Court gave conclusive weight to an interpretation advanced in far less formal documents by an assistant secretary, and the chief counsel, of HUD. Thorpe v. Housing Authority, 393 U.S. 268, 274-76, 89 S.Ct. 518 [552-523], 21 L.Ed.2d 474 (1969). [at 242]
Next came Roberts v. Cameron-Brown Co., 556 F.2d 356 (5 Cir.1977), where a mortgagor brought an action against the Federal National Mortgage Association (FNMA) and a private mortgagee for an injunction to prevent foreclosure of a mortgage and for a declaratory judgment. Plaintiff claimed that the mortgagee and FNMA failed in their duties to inquire into the circumstances leading to her default. They alleged that defendants *65 failed to comply with the guidelines of the HUD Handbook 4191.1. This, they asserted, implied a private cause of action as a defense to a foreclosure. In rejecting these contentions the Fifth Circuit Court of Appeals stated:
HUD did not promulgate the Handbook for the especial benefit of Section 235 mortgagors, and it is not a federal statute, anyway. HUD designed the Handbook for HUD-approved mortgagees in servicing HUD-insured home mortgages, as the Handbook itself states .... the National Housing Act and the regulations promulgated thereunder deal only with the relations between the mortgagee and the government, and give the mortgagor no claim to duty owed nor remedy for failure to follow. [at 360]
The court concluded:
Finally, mortgage foreclosure has traditionally been a matter for state courts and state law, and there are state law remedies available to protect mortgagors from unconscionable mortgages. [at 361]
In Rank v. Nimmo, 677 F.2d 692 (9 Cir.1982), the court held that the Veterans Administration Lender's Handbook and Circular did not create an enforceable duty on the part of the Veterans Administration (VA) to take all reasonable measures to avoid foreclosures. Relying upon Simpson v. Cleland, 640 F. 2d 1354 (D.C. Cir.1981), the Ninth Circuit Court of Appeals held that neither the statutory language nor the legislative history of the VA act provides any "indication of legislative intent ... to create such a remedy," (i.e., implied cause of action) against the private lender. Id. at 697. The Handbook and circulars are general statements of agency policy and procedure, ibid., and do not create an enforceable duty on the part of the VA to take all reasonable measures to avoid foreclosure. Ibid.
In Simpson v. Cleland, supra, the VA manual suggested that the VA urge private lenders to perform adequate loan servicing, counsel veterans with mortgage problems, exercise authority to take assignments, and extend all reasonable forbearance, even when a borrower becomes unable to meet the terms of the loan. Even though the lender and the VA failed to perform as fully as they might, the court held that the procedures outlined in the pamphlet are not binding and are merely suggestions. It further held that there was no implied cause of action under the VA act against the VA or a private lender for failure to assist a *66 veteran borrower to avoid foreclosure. The Simpson court considered four factors formulated by the United States Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[6] to determine that a private cause of action may not be implied against a person who violated governmental regulations. Simpson held that the foreclosure and the litigation stemming from it are matters "traditionally relegated to state law and therefore not actionable here." 640 F.2d at 1360.
See, also, Falzarano v. U.S., 607 F.2d 506, 509 (1 Cir.1979), and Cedar-Riverside Associates, Inc. v. City of Minneapolis, 606 F.2d 254, 256, 257 (8 Cir.1979), for the principle that the National Housing Act does not create a cause of action for violation of statutory obligations.
It is therefore held that the HUD Regulations and procedures in the HUD Handbook are discretionary, not mandatory, and are not a legal prerequisite to foreclosure which is determined by state law. Further, a private cause of action may not be implied against a mortgagee for violation of the HUD regulations and the procedures outlined in the HUD Handbook.
Next to be considered is whether plaintiff's conduct under the facts of this case in failing to comply with the regulations and procedures is so unconscionable and inequitable as to preclude *67 her from relief and bar its right to foreclosure. In Brown v. Lynn (II), supra, the court observed:
The decision does not limit state or federal foreclosure courts from exercising their equity power by refusing to grant foreclosures where mortgagees have flagrantly disregarded the forbearance provisions of the HUD Handbook. [392 F. Supp. at 562]
The Brown II court observed that mortgagees should not be given carte blanche to act with abandon to the limits of the elusive "prudent lender" standard. 392 F. Supp. at 562, 563. Even though the Handbook does not impose legal obligations upon mortgagees, it "does not preclude foreclosure courts from allowing mortgagors to raise non-compliance with the Handbook as a defense to a `quick' foreclosure." Id. at 563. Brown II stated, "a court of equity may restrict a mortgagee who has not within reasonable expectations of good faith and fair dealing followed or applied to guidelines." Ibid.
At the outset it must be stated that the present case is anything but a "quick" foreclosure; the default occurred on November 1, 1980 and the foreclosure was not commenced until November 8, 1981. Also, the only mandatory requirement of the HUD regulations is the obligation of the mortgagee to permit reinstatement of the mortgage, even after institution of foreclosure proceedings, if the mortgagor tenders in a lump sum all amounts required to bring the account current, including foreclosure costs, reasonable attorneys fees, and expenses properly associated with the foreclosure action. 24 CFR § 302,608.
In Associated East Mortgage, supra, the mortgage was executed in June 1972 and the defendant mortgagors made all payments for a period of four years until June 1976. In March 1976 Young, who was a bus driver, went on strike and his income was reduced to strike benefits of $50 a week. Despite this setback the Youngs continued to pay their mortgage with funds from their savings account until it was depleted. As soon as the strike occurred the Youngs went to Associated to request a reduction in monthly payments, which was refused. During the period of unemployment Mrs. Young frequently telephoned *68 Associated to explain their financial circumstances and requested a reduction in the monthly payments, but the requests were rejected. Associated finally consented to a forbearance agreement based on an increase of monthly payments to make up arrearages but the Youngs could make only one payment. On April 6, 1977 Associated instituted the foreclosure action. In May 1972 the strike ended, Young returned to work and he was able to resume his regular installments, which were placed in an escrow account pending the outcome of the foreclosure action. 163 N.J. Super. at 319, 333.
In Associated the Chancery Division characterized plaintiff mortgagee's conduct as "unconscionable" in failing to follow the specific directives of the HUD Handbook, 163 N.J. Super. at 333, and as an "imprudent and callous lender" in servicing defendant's mortgage which should not have the aid of equity. Id. at 33. The court further held that the mortgagee, in failing to comply with the regulations in the CFR and its counterpart the HUD Handbook in servicing the defendant's mortgage, appeared in court with unclean hands and was not entitled to foreclose the mortgage. Ibid.
Contrasted with the facts in Associated are the facts in the present case. On August 1, 1980 the Buehlers conveyed the property to defendant for a total consideration of $52,900. At best, defendants had an equity in the property of $1,000 and made only three monthly payments. In Associated the Youngs, the mortgagors, had built up an equity in the property and when Young went on strike, he immediately contacted the bank even before default. Here, defendant made no attempt to contact plaintiff but was satisfied to sit back for a period of four months after default and completely ignore the eventuality of a foreclosure.
Even though defendant personally knew James Smedley, president of Jefferson, the mortgage servicing agent, she did nothing from November 1, 1980 until early February when Jefferson prodded her to call and discuss the delinquency. Defendant did *69 not have to rely on her experience as a realtor to know that the failure to make monthly payments would culminate in the foreclosure proceedings; she certainly should have made some overtures to plaintiff to explain her circumstances before it was necessary to send her delinquency notices. Granted the arrangement to pay $1,000 a month to make up the delinquency was no practical solution because she could not even pay the regular monthly payments of $679. Nevertheless, she displayed utter indifference to the situation.
From March 1981 to February 1982, after the summons and complaint was served upon her, she made but one phone call to plaintiff concerning the account. In April 1981, when plaintiff took over servicing of the 1,000 accounts transferred from Jefferson, she was told that plaintiff would contact her. She made no further attempts to contact plaintiff and rather relished the fact that no payment book was sent to her; she was perfectly content to put the onus on plaintiff to cater to her. Defendant implicitly excused her failure to make payments on the fact that plaintiff never sent a monthly payment book or payment cards to her.
In July 1981 the tax bill for the second quarter of 1981 was sent to her by plaintiff's mortgage department to identify the tax bill with her account. It has been noted that the account never went to the plaintiff's mortgage department because it was in default when the servicing was taken over from Jefferson. Defendant responded to this on her realtor stationary and merely advised that no account number was assigned. She gave her phone number to plaintiff to contact her but made no mention about the eight-month delinquency. She again was heedless of her perilous situation and did not lift a finger to help herself.
The file acquired from Jefferson contained copies of letters from Jefferson to the Buehlers and defendant addressed to 1517 Haddonfield-Berlin Road in Cherry Hill, New Jersey. The first is dated January 8, 1981, addressed primarily to the Buehlers *70 with defendant's name underneath. This is a form letter taken from Appendix 1 of the HUD Handbook 4330.1 (formerly 4191.1) on Administration of Insured Home Mortgages, and contains all information required by the regulations. There was another form letter dated February 26, 1981, which is a form letter from Appendix 3 of the HUD Handbook. Defendant did not receive the original of these letters. The letter of instructions from plaintiff to its foreclosing attorney states that all correspondence has been returned marked "unclaimed," but that the property is occupied although the occupant is unknown.
When defendant belatedly contacted plaintiff, HUD had already refused to take over the assignment of the mortgage because of the documentation in the original file of Jefferson concerning the returning notices sent to defendant. It is curious that HUD, according to defendant, washed its hands of the entire matter at this juncture. Even after foreclosure under its regulation, HUD is required to make a direct inquiry of the mortgagor for further information to evaluate the situation. HUD Handbook, Chapter 4; Flow Chart, Appendix 35. Nevertheless, defendant had ample notice of the problem as to misdirection of mail addressed to both Buehlers and defendant. At least two letters were forwarded to the Buehlers in Somerdale instead of being delivered to defendant in Cherry Hill, yet she did nothing to correct this situation with the postoffice or inform plaintiff that the property had been conveyed solely to her so that letters would be properly addressed.
Defendant has occupied the property since November 1, 1980, a period of two years, without any payment on account. As contrasted with defendant mortgagors in Associated, she has made no payment to an escrow account as evidence of her good faith. In June 1982 the parties made cross-motions for summary judgment. At that time the judge remarked that he was not impressed with the good faith of defendant in failing to at least make some payments into an escrow account. Typical of defendant's entire attitude in this matter is her direct examination concerning the meeting with Campellone of Heritage sometime *71 in February 1982. She testified that Campellone said to her: "[You] know we have not heard from you," to which she replied; "I told him that I hadn't heard from them...." Such impertinence engenders no more forbearance from a court of Chancery than it did from a mortgage executive.
Unconscionable conduct has been defined as conduct that is monstrously harsh, that is shocking to the conscience. Domus Realty Corp. v. 3440 Realty Co., Inc., 179 Misc. 749, 40 N.Y.S.2d 69 (Sup.Ct. 1943), aff'd without opinion 266 A.D. 725, 41 N.Y.S.2d 940 (App.Div. 1943). While plaintiff and its representatives may have ineptly handled defendant's account because of the initial confusion in the transfer of files from Jefferson to plaintiff, it cannot be said that the conduct was "monstrously harsh" or "shocking to the conscience." "The facts of the instant case belie defendant's castigation of plaintiff as an imprudent and callous lender." Government Mortgage Ass'n v. Screen, 85 Misc.2d 86, 379 N.Y.S.2d 327, 332 (Sup.Ct. 1976). In this case, the exercise of a right to foreclose cannot be deemed to be unconscionable.
The maxim of unclean hands has its limitations. It does not banish all sinful suitors from a court of equity nor does it apply to every unconscientious action or all inequitable conduct. Neubeck v. Neubeck, 94 N.J. Eq. 167, 170 (E. & A. 1922); Goodwin Motor Corp. v. Mercedes-Benz of N.A., Inc., 172 N.J. Super. 263, 271 (App.Div. 1980); Tami v. Pikowitz, 138 N.J. Eq. 410, 413 (Ch. 1946). It is not an arbitrary rule and calls for the exercise of just discretion on the part of the court. Untermann v. Untermann, 19 N.J. 507, 518 (1955). It is the effect of the inequitable conduct on the total transaction which is determinative of whether the maxim of unclean hands shall or shall not be applied. Ibid. A court of equity must administer equitable relief upon equitable terms and not as punishment. DeVita v. Laprete, 75 N.J. Eq. 418, 422 (Ch. 1909), aff'd 77 N.J. Eq. 533 (E. & A. 1909). Whenever the clean hands doctrine is applicable it is invoked, not out of regard for defendant or to punish plaintiff, *72 but upon larger considerations that make for the advancement of right and justice. Medical Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177, 180 (App.Div. 1951).
In balancing the faults and the equities, and considering the character of the conduct of plaintiff and defendant, it is obvious that it is defendant who produced the situation and created the attendant hardship. The initial fault springs from defendant's failure to make some effort to contact plaintiff for a period of four months without payments commencing November 1, 1980. Delinquency notices were sent and received but still defendant did not respond. The facts of the case indicate that some letters addressed to plaintiff were delivered whereas other letters were not. Plaintiff attempted to follow the HUD regulations and the HUD Handbook by sending the required form letters advising defendant of her HUD rights. These letters were not received, not because plaintiff was remiss, but because of defendant's failure to rectify the problem related to the mailing address after knowledge that the mail was being misdirected. Plaintiff's servicing agent, Jefferson, may not have pursued the most persistent course to contact defendant, but certainly defendant, mindful of her failure to make monthly payments and the misdelivery of the mail, did nothing to alleviate the situation. Because of the unsuccessful effort of Jefferson to contact defendant, HUD declined assignment of the mortgage. Defendant herself precipitated the action of HUD by her failure to take prompt steps to correct her mailing address.
Further, defendant materially contributed to her predicament by failing to make any overtures in the beginning to plaintiff concerning her four months delinquency; failing to contact plaintiff about the default for nearly a year, and failing to show any good faith effort to make any payment into an escrow account until prompted by the court. Defendant's flagrantly acquiescent conduct does not induce the court to extend equitable relief to one to whom such culpable negligence can be attributed. The doctrine of clean hands has its logical justification *73 only in consideration of good conscience and natural justice. There are cases in which a court of equity, fulfilling the reasons and objects for its existence may, in furtherance of a natural justice, aid one who is comparatively more innocent. 3 Pomeroy, Equity Jurisprudence (5 ed. 194-) § 942; Laurino v. Laurino, 28 N.J. Super. 119, 124 (App.Div. 1953).
The principal balance on the mortgage is $51,798.71 plus an overdraft in the escrow account of $1,941.21. Interest from October 1, 1981 to November 1, 1982 amounts to $12,356.03. Plaintiff claims late charges of $135 for a period of 21 months, from November 1, 1980 to November 1, 1982. The complaint was filed November 9, 1981 and late charges will be allowed only until November 1, 1981, in the sum of $67.90.
An order for judgment may be presented by plaintiff's attorney in favor of the plaintiff for the sum of $66,163.85 together with costs and taxable attorneys fees, plus interest from November 1, 1982.
NOTES
[1] 29 N.J.Practice, op. cit., at 61.
[2] Id. at 62.
[3] Ibid.
[4] Id. at 62-63.
[5] Id. at 63.
[6] See Jalowiecki v. Leuc, 182 N.J. Super. 22, 29-30 (App.Div. 1981), citing Cort v. Ash, and likewise holding that a private cause of action may not be implied for violation of a regulation promulgated under the Realty Improvements & Facilities Act (1954), N.J.S.A. 58:11-23 et seq. If the FHA regulations were intended to create private rights, they would have so stated. Cf. Hospital Center at Orange v. Cook, 177 N.J. Super. 289 (App.Div. 1981), where the Appellate Division relied upon federal legislation and its implementing regulations and the weight of federal case law to bar the right of a subsidized hospital to collect for services from an indigent person when it failed to give notice of the availability of beneficiaries under the Hill-Burton Act, 42 U.S.C.A. § 291 et seq. Accord, Cooper Medical Center v. Boyd, 179 N.J. Super. 53 (App.Div. 1981).