**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2414-21

IN THE MATTER OF
THE ESTATE OF OLGA
DORNIC, deceased.

_____

Submitted February 7, 2024 – Decided February 27, 2024

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. P-000532-20.

Law Offices of Matthew M. McDowell, LLC, attorneys for appellants Stanislav Birosik, Jan Birosik, Jaroslav Birosik, Robert Birosik, Ivan Dornic, Milan Dornic, Anna Mikitova, Daniela Knapikova, Maria Kravcikova, Helena Brotonova, Margita Gladisova and Helena Ridillova (Matthew Mark McDowell and Annie Muldowney, on the briefs).

Walsh & Walsh, LLC, attorneys for respondent Patricia DiPaolo (John K. Walsh, Jr., of counsel and on the brief).

PER CURIAM

Appellants, decedent Olga Dornic's cousins of varying degrees—Stanislav Birosik, Jan Birosik, Jaroslav Birosik, Robert Birosik, Ivan Dornic, Milan Dornic, Anna Mikitova, Daniela Knapikova, Maria Kravcikova, Helena Brotonova, Margita Gladisova and Helena Ridillova—appeal from a February 28, 2022 Chancery Division order for judgment dismissing their verified complaint with prejudice. Appellants sought: a declaration of heirship, to compel respondent Patricia DiPaolo and others to establish heirship, to close the class of heirs, and to compel an informal accounting. The judge dismissed the complaint under the doctrine of laches. We affirm.

I.

We derive the pertinent facts from the record. On February 3, 2008, decedent died intestate. Decedent never married, had no children, and was not survived by a parent, sibling, or grandparent. On February 15, 2008, DiPaolo, decedent's cousin, filed an application for administration with the Bergen County Surrogate Court. The application for administration identified three individuals in addition to herself as decedent's cousins: Mark Semeraro, John Takach, and Anna Gaido. These three individuals and DiPaolo's mother, Mary Takach Scheper, executed renunciations of administration in support of DiPaolo's application for administration.

On March 25, 2008, the Bergen County Surrogate appointed DiPaolo as the estate's administratrix. Her appointment was secured by a $206,000 surety bond. DiPaolo retained the legal services of her long-time family lawyer, William R. McClure, to represent her regarding her legal and fiduciary obligations to the estate.

According to DiPaolo, McClure advised her to attempt to locate a will for decedent. DiPaolo searched decedent's house and safety deposit box but did not find a will. DiPaolo located bank accounts, certificates of deposit, and stock. She also paid the estate's bills and kept a list of expenses. DiPaolo recalled "checking in" with McClure numerous times to "see what was going on," and he informed her that he was validating the potential heirs. During the administration process, DiPaolo claims McClure communicated with her by phone and by email. DiPaolo said McClure explained how heirship was determined and the percentages each heir was entitled to. DiPaolo was informed by McClure that he would retain the balance of decedent's assets until he had sufficient information to verify heirship.

DiPaolo had decedent's house cleaned out, made repairs, and listed it for sale with a local realtor. On June 30, 2008, counsel from Florio & Kenny, LLP (the Florio firm) entered notices of appearance with the Bergen County

3

Surrogate on behalf of fifteen paternal first cousins once and twice removed as interested parties and potential beneficiaries of the estate.[1] The Florio firm also requested McClure provide an informal statement of decedent's assets and debts. On July 10, 2008, the Florio firm filed an amended notice of appearance to add Jan Dornic as another potential beneficiary.

By letter dated August 4, 2008, McClure wrote to the Florio firm to advise of the then-estimated value of the estate:

> At this point it looks like the gross estate is approximately $440,000 (assuming that the Garfield . . . real estate is worth $200,000). My client [DiPaolo] just discovered that the decedent owned 9,119 shares of Valley National Bank stock (current price $19.59/sh) and 435 shares of Chevron common stock (current price $83.69/sh). The decedent also had two small savings accounts, one personal checking account, and three small certificates of [d]eposit, all six which totaled approximately $21,129.

McClure also requested a current genealogy chart. On November 13, 2009, more than a year later, the Florio firm sent McClure a letter containing vital statistical documentation, which demonstrated the familial relationship between their clients to decedent.

---

[1] These individuals include Ann D. Dangelewicz, Jan Birosik, Jaroslav Birosik, Robert Birosik, Ivan Dornic, Milan Dornic, Anna Mikitova, Daniela Knapikova, Maria Kravcikova, Helena Brotonova, Margita Gladisova, Helena Ridillova, and Danka Herr.

A-2414-21

On March 23, 2010, the Florio firm sent another letter to McClure seeking an updated status on the estate administration and an expected completion date for the accounting and refunding bonds and releases. The record does not disclose any response from McClure.

Several months later, the Florio firm sent McClure a letter referencing its prior letters and requesting responses. On August 10, 2010, the Florio firm sent another follow-up letter to McClure, which went unanswered. Nearly a year later, on June 13, 2011, the Florio firm sent a letter to McClure identifying the four prior unanswered letters and noting their frustration. Four months later, on October 4, 2011, the Florio firm again wrote a letter to McClure seeking answers to questions relating to the estate administration and when distributions could be expected. The letter further stated that the Dornic family intended to investigate the estate.

On February 12, 2012, the Florio firm wrote a letter to McClure to confirm a telephone conference between counsel, and that McClure would prepare refunding bonds, releases, and an accounting "th[at] week." On November 9, 2012, the Florio firm sent a letter to McClure confirming a telephone conversation during which McClure stated the accounting and refunding bonds and releases were completed, and he would forward the documents to the Florio

5

firm. Two months later, on December 28, 2012, the Florio firm sent McClure another letter stating it had not received the documents promised in the November 9, 2012 telephone conversation and letter.

The Florio firm sent follow-up letters to McClure on March 13 and June 18, 2013, seeking the documents. On August 9, 2013, the Florio firm wrote to McClure to confirm an August 5, 2013 conversation in which McClure stated he "would complete the accounting and release and refunding bonds for the estate" and provide them to counsel. On February 26, 2014, the Florio firm sent another follow-up letter to McClure, documenting the lack of any response to its multiple letters and phone calls.

Six months later, on August 19, 2014, the Florio firm sent a letter to McClure for "at least the thirteenth time" demanding an accounting and release and refunding bonds. Counsel noted the Florio firm's representation of appellants for nearly "a half-decade" and recounted its efforts to obtain information.

In September 2015, current counsel substituted in place of the Florio firm as counsel of record for appellants and requested a copy of the Bergen County Surrogate's estate file, which he received the following month. Appellants' counsel then discovered that refunding bonds and releases had been executed by

6

DiPaolo and six of her "known" family members—Semeraro, Gaido, Takach, Aleta Takach-Rowe, Steven Takach, and another individual named John Takach. Appellants assert that other than the filing of the refunding bonds and releases with the Surrogate, no further action had been taken by DiPaolo or McClure to close the class of heirs.

On December 12, 2015, DiPaolo, McClure, and the surety were notified of appellants' claims to the estate as surviving heirs-at-law.[2] On December 21, 2015, appellants' counsel filed a notice of appearance with the Bergen County Surrogate's Court and sent a letter to McClure, DiPaolo, and the surety reciting the efforts undertaken by the Florio firm to respond to the requests. Appellants' counsel stated in his letter that he would file an order to show cause (OTSC) unless he received a response from McClure by January 18, 2016.

On January 13, 2016, McClure responded and stated appellants' counsel was either misinformed or did not have all the facts. In addition, McClure questioned the identity of counsels' clients, inquiring whether he represented the genealogy research company or the purported beneficiaries. Neither counsel nor

---

[2] The record indicates there is a Law Division action pending against the surety company.

appellants responded, no OTSC was filed, and there was no further action taken by appellants or their counsel for the next five years.

McClure passed away on April 17, 2020. The former Bergen County Assignment Judge appointed Steven M. Kalebic, Esq. as trustee to oversee the closing of McClure's practice. Kathy A. McClure, Esq., McClure's widow reviewed all of his files. She located a "closed" file entitled, "Estate of Olga Dornic." After Kathy A. McClure contacted DiPaolo to discuss the disposition of the closed file, DiPaolo authorized the file to be shredded because she felt there was no need to keep it. DiPaolo also destroyed copies of her file.

Other developments included the deaths of two heirs who received distributions, Gaido and Semeraro, who died in November 2016, and December 2019, respectively. They had received distributions from the estate more than ten years earlier. In 2017, an additional genealogical line of maternal relatives was discovered. The surviving family members retained appellants' counsel to seek redress on their behalf.

On December 15, 2020, appellants filed their verified complaint. The Bergen County Surrogate issued an OTSC. DiPaolo filed opposition and a certification seeking to dismiss the verified complaint and discharge the OTSC. DiPaolo certified that prior to decedent's death, decedent made funeral

arrangements and advised the funeral director that DiPaolo's mother was her closest living relative and a first cousin on her maternal side of the family.

DiPaolo also certified that she never heard decedent or her mother mention any of appellants' names, she "was completely unaware" of them, and later learned they lived in Slovakia. Because the matter was "concluded so long ago," DiPaolo stated she felt there was no need to retrieve the file from Kathy A. McClure. DiPaolo certified she was "prejudiced by the passage of time, lack of records and death of [her] attorney who administered the estate," and requested the court dismiss the verified complaint with prejudice.

Kathy A. McClure submitted a certification stating she reviewed the client files in her late husband's office and found decedent's estate file in June 2020. After discussing the matter with DiPaolo, Kathy A. McClure certified DiPaolo decided the "matter had been concluded so long ago that it was not necessary to retrieve" the file and authorized the shredding of its contents. Kathy A. McClure also certified that she searched her husband's computer and located "some documents related to the Dornic estate," which she turned over to DiPaolo's present counsel. Counsel for appellants filed a supplemental certification in response, claiming he never received McClure's January 13, 2006 letter, and all

communications he received from McClure and the surety were attached as exhibits to the verified complaint or his prior certification.

On May 13, 2021, Judge Edward A. Jerejian denied DiPaolo's motion to dismiss the verified complaint and discharge the OTSC. The judge allowed limited discovery, which resulted in the trustee retrieving 126 pages of documents from McClure's computer, including some bank statements and an informal accounting prepared for the estate that identified several appellants as heirs of the estate and that $178,546.57 of estate assets was "set aside" for them. This reserve amount was confirmed in the inheritance tax return filed with and released by the New Jersey Division of Taxation. No distribution had been made to appellants, and DiPaolo confirmed she does not know where the $178,546.57 in estate assets is located.

During discovery, the New Jersey Division of Taxation released its file maintained on the estate, including the inheritance tax return, which mirrored the informal accounting found on McClure's computer. The trustee sent subpoenas to Valley Bank, Bank of America, and Fidelity Bank, where decedent had maintained accounts, but was unable to obtain decedent's records because they had been destroyed, ostensibly due to the passage of time.

10

At the close of discovery, DiPaolo renewed her motion to dismiss. On February 28, 2022, Judge Jerejian heard oral argument and rendered a comprehensive oral decision granting the motion to dismiss the verified complaint with prejudice based upon the doctrine of laches.

First, the judge found that the time for appellants to assert claims against McClure for allegedly mishandling the estate, the claims against DiPaolo for not supervising what McClure was doing, or any other issue, related back to when the Florio firm was first involved with the case, which was "long before five years before [McClure] passed." Additionally, the judge noted appellants' failure to act until 2020, despite communications dating back to 2008, and their retaining new counsel during that time.

Second, the judge observed that appellants failed to provide any reason for the delay. He noted appellants as a group delayed bringing suit following decedent's death and for many years after no communication with McClure.

Third, the judge found DiPaolo was prejudiced by appellants' delay because McClure died. The judge reasoned:

> Five years of no sign of activity, so [DiPaolo] figured the cause or the issue was abandoned.
>
> There is no longer a file. That is why th[is court] . . . gave an opportunity to see if we could reconstruct or if

there were monies escrowed, or there is something that
. . . McClure has that [DiPaolo] doesn't know about.

People hire attorneys. [The court] understand[s] that
[DiPaolo] is ultimately responsible, but you hire an
attorney and I am not sure every step of the way the
client knows exactly what is happening.

But, you know, the file was able to be reconstructed . . .

So is [DiPaolo] dealing in bad faith? I don't think the
[c]ourt can conclude that because five years after the
letter threatening suit, nothing happened. [McClure]
dies, the case is abandoned as far as in her mind.

So I don't find that there is any bad faith.

    . . . .

And being that there is now not a file and . . . McClure
has passed, and you could say, well, was that done
deliberately? The file should have been maintained.

I mean, cases end. It is not like six months went by, or
a year. I mean, five years went by after all the other
delays, so we are from 2008 and now it is 2022 . . . .

[(Emphasis added).]

In summary, the judge concluded:

[W]e had [] big delays in the beginning and at the end,
and the [c]ourt does find that it would prejudice
[DiPaolo] at this point, regardless of what happened
previously. Because we are talking about the time, and
the delay, and the length which was considerable under
any measure of any case, and there is not sufficient

12

reason for it. And the circumstances did change; namely being [McClure's] death.

So after considering everything—and I understand the merits that are being raised, I understand what could have been done or maybe should have been done, but given these gaps in time, given the facts which I have alluded to, the [c]ourt finds <u>that the equitable [d]octrine of [l]aches does apply</u> . . . .

And as a result, I am going to grant the application to dismiss the [verified] complaint.

[(Emphasis added).]

A memorializing order was entered. This appeal followed.

On appeal, appellants present one argument for our consideration: the judge erred in applying the equitable defense of laches to nullify DiPaolo's statutory fiduciary duty to account for the estate's assets and distribute assets to appellants because the judge failed to consider DiPaolo's unclean hands and the inequities between the parties. We are unpersuaded.

## II.

Appellants claim the trial court's application of the doctrine of laches was error. Laches is an equitable affirmative defense barring recovery where unexplainable and inexcusable delay in bringing suit prejudiced another party. <u>Fox v. Millman</u>, 210 N.J. 401, 417 (2012). The trial court has discretion to apply laches based on the particular circumstances of the case. <u>Mancini v. Twp. of</u>

Teaneck, 179 N.J. 425, 436 (2004). The factors that control the decision include the length of delay, reasons for the delay, and changes in the parties' conditions attributable to the delay. Cnty. of Morris v. Fauver, 153 N.J. 80, 105 (1998); see also Knorr v. Smeal, 178 N.J. 169, 181 (2003) ("The core equitable concern in applying laches is whether a party has been harmed by the delay.").

Decisions regarding application of the doctrine are reviewed for abuse of discretion. See United States v. Scurry, 193 N.J. 492, 503-04 (2008) (holding "the application of the doctrine of laches . . . constituted an abuse of discretion . . . ."). Laches may apply if a party has both knowledge and opportunity to assert his [or her] rights in the proper forum. Fauver, 153 N.J. at 105.

III.

Appellants argue the judge failed to adequately consider the equities between the parties and afforded DiPaolo the protection of a laches defense despite her unclean hands and failure to fulfill her fiduciary duties. In their reply brief, appellants identify DiPaolo's breaches of her fiduciary duty as not adequately supervising McClure and authorizing his widow to destroy the file when the sum of $178,546.57 was set aside for other relatives and is now unaccounted for.

We are satisfied the judge properly found that laches barred appellants' claims. Appellants attempt to assert a reason for the delay for the first time explaining additional alleged relatives were discovered between 2015 and 2017, and these "individuals did not have knowledge of their own rights in this matter until approximately three years before the underlying [verified] complaint was filed in 2020."

However, appellants have proffered no excuse for the lengthy delay between decedent's death, correspondence from the Florio firm and their present counsel, and the filing of their verified complaint. Moreover, there was no communication from appellants' current counsel with DiPaolo or McClure for five years. More than fourteen years passed from decedent's death until appellants filed a verified complaint. There is no reasonable excuse proffered for this delay.

Appellants argue there is no prejudice to DiPaolo because she received her statutory commission of $20,000 and a distribution of $59,515.49, for a total of $79,515.49 from the estate. They contend DiPaolo "did not conclude this estate administratively or otherwise" by seeking court assistance to close out the class of heirs, notifying the Attorney General's office as representative of the New Jersey Unclaimed Property Fund of the existence of missing or unknown

15

heirs, or confirming with McClure the distribution of any alleged assets escrowed by him to address claims of those individuals "whose heirship he questioned."

The doctrine of laches cannot be used to reach an inequitable result. See Linek v. Korbeil, 333 N.J. Super. 464, 475 (App. Div. 2000) (holding the "tools of equity jurisprudence cannot validly be used to sponsor an inequitable result"). However, its application here does not violate the principles of equity because of the extraordinary delay and prejudice to DiPaolo, the estate, and the beneficiaries who received distributions many years ago, two of whom are now deceased.

It would be inequitable to force the estate, twelve years after decedent's death and five years after appellants stopped communicating with DiPaolo or her counsel, to pay claims that were known and potentially enforceable by appellants much earlier. Moreover, DiPaolo did not retain and does not possess any funds from the estate. McClure's time records were located and detailed the extensive involvement DiPaolo had in the estate administration. Judge Jerejian did not abuse his discretion in applying laches to conclude appellants' delay is unreasonable and inexcusable and that DiPaolo could reasonably conclude that appellants abandoned their claims.

16

IV.

We also reject appellants' argument that DiPaolo has unclean hands and was not entitled to a laches defense.  In order to recover in equity, a party "must be with clean hands."  Heuer v. Heuer, 152 N.J. 226, 238 (1998).  The unclean hands doctrine provides, "a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit."  Faustin v. Lewis, 85 N.J. 507, 511 (1981).

There are limits to the doctrine's application.  Heuer, 152 N.J. at 238.  For example, the unclean hands doctrine "should not be used as punishment but to further the advancement of right and justice."  Pellitteri v. Pellitteri, 266 N.J. Super. 56, 65 (App. Div. 1993) (citing Heritage Bank, N.A. v. Ruh, 191 N.J. Super. 53, 71-72 (Ch. Div. 1983)).  The doctrine:

> does not repel all sinners from courts of equity, nor does it apply to every unconscientious act or inequitable conduct on the part of the complainants.  The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action; but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought.
>
> [Heuer, 152 N.J. at 238 (quoting Neubeck v. Neubeck, 94 N.J. Eq. 167, 170 (E. & A. 1922)).]

17

Applying the doctrine of unclean hands is within the court's discretion. Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 158 (2001). Here, Judge Jerejian's decision to forego applying the doctrine of unclean hands was supported by substantial credible evidence in the record and did not bar application of the doctrine of laches. And, appellants conceded in their merits brief that "there is no proof of blatant wrongdoing or malfeasance." Thus, it was not an abuse of discretion to decline to find DiPaolo had unclean hands.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION