BENJAMIN YEISER, SR., AS ANCILLARY GUARDIAN OF JOHN YEISER, BENJAMIN YEISER, JR., AND RUTH YVONNE YEISER, MINORS AND HEIRS OF THE LATE MINNIE YEISER, NEE SHELTON, ALSO KNOWN AS MINNIE ROGERS, DECEASED, PLAINTIFF-RESPONDENT, v. RAYMOND ROGERS, DEFENDANT-APPELLANT, AND RAYMOND ROGERS, JR., AN INFANT OVER 14 YEARS OF AGE, DEFENDANT.

Argued May 31, 1955—Decided June 27, 1955.

*Mr. George F. Losche* argued the cause for appellant (*Messrs. Schneider & Schneider*, attorneys).

*Mr. Samuel A. Bloom* argued the cause for respondent.

The opinion of the court was delivered by

HEHER, J.   The action is in ejectment by the children and heirs at law of Minnie Yeiser, who in life, late in 1945, not long after her husband, Benjamin Yeiser, divorced her, entered into illicit cohabitation with the defendant Rogers which continued until her death on October 22, 1951. She died intestate, seized of a dwelling house in Englewood, New Jersey, No. 405 Grand Avenue, where she and Rogers had cohabited. The title to the property was conveyed to her alone on July 31, 1950 under a contract of purchase she made on the prior June 13, for the consideration price of $15,000, of which $8,000 was paid in cash supplied by Rogers and the balance was satisfied by her assumption of a subsisting mortgage on the lands of $7,000 plus.

Rogers counterclaimed alleging that Minnie "purchased" the property to his "use, ownership and enjoyment" and seeking the declaration of a resulting trust for his benefit.

Rogers was a professional gambler, the "banker" in the pursuit of a "numbers game"; and some time prior to the purchase of the property the Federal Government had attached his automobile and bank account, presumably to enforce a claim for taxes allegedly in default. He had on an earlier occasion entered into a trust agreement with his sister and a niece. The motive for concealing his asserted ownership of the property is not hard to divine; his business was unlawful, a continuing defiance of the law, and he lived in fear and apprehension, not only of criminal prosecution, but of the seizure of his assets to satisfy claims for taxes on his ill-gotten income. We are convinced that this was the fact.

Rogers and Minnie had lived an unconventional life together in New York before moving to New Jersey, to satisfy their longing for a suburban residence; and, as found by the Appellate Division of the Superior Court, 32 *N. J. Super.* 581 (1954), the "enjoyment of the use of the property perpetuated the enjoyment of their informal and illicit affinity."

The equitable cause of action was given precedence; and the county judge found that title to the property was placed in Minnie so that Rogers' "creditors could not attack it," and there was, "at least in the mind of Rogers, an intention some day to have the title vested in him or a corporation" to be formed for the purpose, and he entered judgment declaring a resulting trust and directing a conveyance to defendant.

Accepting the finding that defendant caused the conveyance to be made to Minnie so "that creditors could not attack it," the Appellate Division, applying the clean-hands doctrine, reversed the judgment and remanded the cause for trial of the law action. *Semenowich v. Melnyk*, 93 *N. J. Eq.* 615 (*E. & A.* 1922), was invoked for the principle that the "rights of frauddoers are not looked at in the light of the wrong they accomplish but of the wrong they plan." And

adherence was given to the "principle that in all species of resulting trust, intention is the superior element of consideration," citing *Gordon v. Griffith*, 113 *N. J. Eq.* 554 (*Ch.* 1933). Judge Jayne found that the county judge "justifiably determined the facts," but "erred in his consequent decision."

The case is here by this court's certification at the instance of the defendant.

The argument, in sum, is that there is no evidence that Rogers "had any creditors, present or anticipated," and no evidence that he "owed the United States any money or obligation, present or anticipated," and no evidence that "one of the instigating motives for establishing the alleged trust was to evade payment of federal income tax," as charged by plaintiffs. We think otherwise.

■ It is not requisite, to bar relief, that present creditors be in contemplation. Under *R. S.* 25:2–3, rendering void a conveyance "with intent to hinder, delay or defraud creditors and others of their lawful actions, debts, damages or demands," a subsequent creditor can impeach a voluntary conveyance by showing fraud in fact—*i. e.* "an actual fraudulent intent to defraud some creditor." *Washington National Bank v. Beatty*, 77 *N. J. Eq.* 252 (*E. & A.* 1910). See also *Claflin v. Mess*, 30 *N. J. Eq.* 211 (*Ch.* 1878); *Haston v. Castner*, 31 *N. J. Eq.* 697 (*E. & A.* 1879); *Hagerman v. Buchanan*, 45 *N. J. Eq.* 292 (*E. & A.* 1889); *Zinn v. Brinkerhoff*, 48 *N. J. Eq.* 513 (*Ch.* 1891); *Kinsey v. Feller*, 64 *N. J. Eq.* 367 (*E. & A.* 1901); *Eastern Sash & Door Co. v. Meister*, 99 *N. J. Eq.* 819 (*Ch.* 1926). And by the Uniform Law, *R. S.* 25:2–13, every "conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors is fraudulent as to both present and future creditors." See *In Re Club Evergreen*, 33 *F. Supp.* 536 (*D. C. N. J.* 1940); *Freitag v. The Strand of Atlantic City*, 205 *F. 2d* 778 (*3rd Cir.*, 1953).

The defendant Rogers' New York attorney testified that in Minnie's presence and in his, Rogers said that

"the reason he wanted—he didn't want his name to go on the deed at that time, particular time, was that some time previously the government had seized all the money he had in the Empire— The Empire City Savings Bank; also his car, and that he didn't want to put his name on the blank, I mean, on the deed.

Q. Now you told us further on direct examination that he said to you that the reason why he wanted the property purchased in Minnie's name was the Federal Government had tied up some of his resources or funds?

A. They had seized the resources and taken it. * * * Well, they took his money from the bank and they took his automobile. They said he owed them taxes. He told me that they said he owed them taxes. * * *

Q. Rogers talked to you about this property when he first made the contract, and it was then that he told you that the government had seized his property in the bank and also his car, and he didn't want to repeat it, or he didn't want it to be repeated. Right?

A. He spoke to me, I knew that before the property was involved, Judge. * * * The contract was made before I got into the picture. I said between the time of the making of the contract and the closing, they came to me, but I had known about the seizure * * *."

There can be no doubt that Rogers' purpose was the placing of his property beyond the reach of the Federal Government for the satisfaction of *in futuro* taxes assessed against him. And it is equally inferable that he also had in mind other future creditors, unless, perchance, he intended to settle the property upon Minnie. Rogers acknowledged affection for Minnie. And he conceded cohabitation in fact and living together as husband and wife to all outward appearances. See *Scott on Trusts, section* 442.

But whatever may have been his long-range resolve, his immediate purpose was to secure the property for his own use and Minnie's against the reach of subsequent creditors, primarily the Federal Government; and, such being the case, the law will refuse to enforce the resulting trust that is ordinarily predicable of an intention to give the transferee a bare legal title without beneficial interest.

Illegality of purpose usually precludes enforcement of a resulting trust that would otherwise arise in the given circumstances. And where the title to the purchased property is taken in the name of another for the purpose of defrauding

creditors, the purchaser of the property cannot enforce a resulting trust. *Baldwin v. Campfield*, 8 *N. J. Eq.* 891 (*E. & A.* 1853); *Sayre v. Lemberger*, 92 *N. J. Eq.* 656 (*E. & A.* 1921); *Gascoigne v. Gascoigne* (1918), 1 *K. B.* 223. "No principle of law is better settled in this state than that a conveyance, designed in fraud of creditors, is good *inter partes*"; the implication of law that the grantee takes a conveyance in trust for a person who furnished the purchase money "may be rebutted by proof that the title was put in the grantee for the purpose of protecting the property from creditors of him who furnished the purchase money." *Cutler v. Tuttle*, 19 *N. J. Eq.* 549, 562 (*E. & A.* 1868).

Professor Scott refers to cases holding that where the purchase is made for the purpose of defrauding the government, a resulting trust will not be enforced. The question in each case "is whether the policy against the unjust enrichment of the grantee is outweighed by the policy against giving relief to the payor who has entered into an illegal transaction." *Scott on Trusts, section* 444.

█ And we also have the clean-hands doctrine that "He that hath committed iniquity shall not have equity." This is "a universal rule guiding and regulating the action of equity courts in their interposition on behalf of suitors for any and every purpose, and in their administration of any and every species of relief"; the maxim is that "whenever a party, who as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." *Pomeroy's Equity Jurisprudence (5th ed.), section* 397.

We are told that the county judge refused to invoke the clean-hands doctrine in the exercise of a sound discretion; and it was error for the Appellate Division to interfere. For the reasons stated, we hold the contrary view. And we are clear that the principle of *Neubeck v. Neubeck*, 94 *N. J. Eq.* 167 (*E. & A.* 1922), limiting the application of the maxim

to cases where "the particular claim is tied up to inequitable conduct as an element of its creation," is not disserved by this result.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.