SALLY L. UNTERMANN, PLAINTIFF-APPELLANT, v. JOHN JOSEPH UNTERMANN AND SARAH CAYER KALTMAN, ALSO KNOWN AS SARAH CAYER UNTERMANN, DEFENDANTS-RESPONDENTS.

Argued September 19, 1955—Decided October 24, 1955.

Mr. *Edward R. McGlynn* argued the cause for the appellant (*Messrs. McGlynn, Weintraub & Stein*, attorneys).

Mr. *Irving Siegler* argued the cause for the respondents (*Messrs. Siegler & Siegler*, attorneys).

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal from a judgment of the Appellate Division, 35 *N. J. Super.* 367, which affirmed a judgment of the Superior Court, Chancery Division, dismissing the complaint of the appellant in which she sought a declaratory judgment with respect to her marital status and her present relationship with the respondent, Untermann.

An appeal was taken in this case pursuant to *R. R.* 1:2–1(*a*) and also an application was made for certification pursuant to *R. R.* 1:10–2(*d*) which we have granted.

The complaint was filed under the Declaratory Judgment Act, *N. J. S.* 2A:16–50 *et seq.*, which confers upon our courts of record, within their respective jurisdictions, power to declare rights, status and other legal relations, although no further relief is or could be claimed. *McCrory Stores Corporation v. S. M. Braunstein, Inc.*, 102 *N. J. L.* 590, 592 (*E. & A.* 1926). The complaint was properly filed in the Superior Court, Chancery Division, which has jurisdiction of the subject matter of the suit. *Lawler v. Lawler*, 2 *N. J.* 527 (1949).

The complaint states the appellant married the respondent on April 15, 1929 without disclosing where this marriage occurred or a prior divorce decree obtained by her on the same day in Reno, Nevada. It then alleges the respondent Untermann divorced her in Mexico on September 28, 1953,

that this divorce is void, and then, apparently referring only to this latter divorce, alleges "there might be a serious legal doubt as to the legal status of her marital rights insofar as the defendant, John Joseph Untermann, is concerned." The complaint demands a declaratory judgment: (a) that shall fix and determine the marital status of the plaintiff; (b) that the alleged divorce obtained by the defendant John Joseph Untermann on September 28, 1953 in the Republic of Mexico in no way affects the marital status of the plaintiff; (c) that the purported marriage between John Joseph Untermann and Sarah Cayer Kaltman on October 25, 1953 in the State of Connecticut does not legally affect the marital status of the plaintiff; (d) that the plaintiff is the sole and only wife of the defendant John Joseph Untermann; (e) that the defendant Sarah Cayer Kaltman, also known as Sarah Cayer Untermann, is not, so far as the rights of the plaintiff are concerned, the legal wife of John Joseph Untermann, in the State of New Jersey.

At the trial the following facts, which in most instances should be public records, were developed.

On October 16, 1916 appellant was married to one Harold Edward Cheney in Syracuse, N. Y. Two children were born of the marriage and the family came to Newark in 1918, and except for the period of time spent in Nevada to obtain her divorce from Cheney she has lived here ever since. Between 1923 and 1928 she instituted four separate actions in the Court of Chancery. Docket 54/598 was a proceeding of custody and support. This matter was completely litigated and an award of custody was made to the husband, Cheney. Thereafter she instituted actions for divorce on the grounds of extreme cruelty on three different occasions; Docket 60/575, in which no process was issued; Docket 66/241, which was litigated and the question of custody was adjudged to be *res adjudicata* and the proceeding dismissed; and Docket 66/710, which was dismissed on her motion.

Apparently some time prior to April 15, 1929 she went to Reno, Nevada, leaving her husband and two children, then 9 and 11 years of age, in Newark. On April 15, 1929 she

received a decree of divorce *a vinculo* from Cheney, in the Second Judicial District Court, in the State of Nevada, County of Washoe. She neither sought nor obtained custody of the two children named in the complaint. Process in the case was by substituted service in lieu of personal service in that state and jurisdiction was obtained by publication and serving Cheney personally in the City of Newark. There was no personal service in the "divorce state." *Cook v. Cook*, 342 *U. S.* 126, 127, 72 *S. Ct.* 157, 96 *L. Ed.* 146 (1951).

The complaint in this case alleges that "on the 15th day of April, 1929, plaintiff and defendant, John Joseph Untermann were married and lived together as man and wife from that date up to August, 1947." No marriage certificate was produced by either party, but the testimony of the appellant, which seems to be concurred in by the respondent, is that they were married in Reno on the same day the decree was granted.

The appellant's prior husband, Harold Edward Cheney, died on July 14, 1945. It does not appear whether Cheney remarried and had children or acquired any realty or other estate which might be affected if the Nevada decree were invalidated.

The final facts in this tangled skein are that on September 28, 1953 the respondent Untermann, on a one-day residence in Juarez, Mexico, obtained a decree of divorce from the appellant and one month later married the defendant Sarah Cayer Kaltman in Greenwich, Conn., on October 25, 1953.

On the trial of the issue below the following facts were brought out on cross-examination of the appellant, which were largely corroborated by the testimony of the respondent Untermann. She admitted attempting to obtain a divorce in this State on the grounds of extreme cruelty, and that prior to her departure for Reno Untermann purchased a home at 20 Evergreen Place, Maplewood, N. J., and the appellant assisted in furnishing that home. Just what the posture of the title to this particular real estate is does not appear clear in the record, although there is a suggestion that it is a tenancy by the entirety. We have some difficulty follow-

ing this suggestion, if title was taken in such a manner prior to the Nevada decree. If they were not husband and wife at the time the title was taken, a tenancy in common merely would be created. *Cf. Danes v. Smith,* 30 *N. J. Super.* 292, at *page* 305 (1954), and the cases cited there.

She filed her complaint for divorce in Nevada on February 26, 1929, alleging she had taken up her residence in Reno with the intention to remain permanently and that said intention still continued. It is not disputed that Untermann paid all her expenses and had arranged to meet her in Reno, marry her, and return to the home just mentioned. He arrived in Reno the night before the decree was granted and they were married on the next day. They went on a honeymoon to California and then returned to New Jersey and lived together as man and wife until April 1939 or 1940, from which time they were separated. But the appellant claims that she had sexual relations with the respondent in a Miami Beach Hotel in August 1947. This he vehemently denies. It is to be noted that this date of August 1947 is subsequent to the death of her first husband, Cheney, in 1945.

The answer of the defendant Untermann alleged the validity of the Mexican divorce and further alleged by way of an affirmative defense that the divorce decree of the appellant in Nevada was void and not entitled to full faith and credit. The defendant Sarah Cayer Untermann filed an answer and counterclaim seeking to establish the validity of her marriage to Untermann, following the same grounds alleged by him.

The trial court, after reviewing the facts, dismissed the complaint and both the counterclaims. The complaint was dismissed both on the ground of unclean hands and the ground that the plaintiff was seeking affirmative relief by way of declaratory judgment and, therefore, had the burden of establishing a valid marriage relationship between her and the respondent Untermann, and in this she failed. Both counterclaims were dismissed on the ground that the respondents had no standing to collaterally attack the Nevada decree. Only the appellant appealed the dismissal of her complaint.

■ The Appellate Division in affirming, while conceding that the appellant was not attacking the Nevada decree, stated that where she seeks a declaration of status which involves the basic question of the legality of her own marriage, which in turn depends upon the validity of her prior divorce, and she furnishes the facts showing inequitable conduct in the procurement of that divorce, the bar of unclean hands may be raised against her. With this holding we are in accord for the reasons stated later.

■ The appellant argues she is entitled to affirmative relief both under the general equitable jurisdiction of the court and under the Declaratory Judgment Act. She argues it has always been within the jurisdiction of equity to adjudge marital status, as, undoubtedly, a species of equity's *quia timet* jurisdiction. The answer to that is that in this State the exercise of the general jurisdiction of the equity courts has always been discretionary and not mandatory and that this principle likewise applies to an action brought under the Declaratory Judgment Act in the Chancery Division of the Superior Court. It is a question of discretionary jurisdiction rather than a liberal attitude toward declaratory relief under the statute. These two ideas are not inconsistent.

The appellant further contends that under the Full Faith and Credit Clause, *art.* IV, *sec.* I of the *United States Constitution*, as implemented in 28 *U. S. C. A., sec.* 1738, the Appellate Division was in error when it questioned the validity of the Nevada decree. The ultimate purport of such a contention is to ask this court to establish the marital status of the appellant in a legal and factual vacuum. That we are not compelled to do.

■■ As we pointed out, there was no personal service on appellant's husband, Cheney, in the "divorce state." We have held, and we believe consistently with the holdings of the United States Supreme Court, that where the jurisdiction of a foreign tribunal is predicated upon a fiction or alleged fact of domicile of the plaintiff, and substituted service, in

lieu of personal service, is used in an attempt to secure jurisdiction of a non-resident defendant, a state not a party to the exertion of such judicial authority but affected by it has the right, when asserting its own unquestioned authority over its domiciliaries, to ascertain the truth of the existence of the crucial fact of domicile upon which the foreign judgment or decree is based. The finding of fact of domicile by any state where personal service of the defendant is not obtained in that state, does not foreclose all the other states in the protection of the rights of domiciliaries in their relation to their social institutions. *Lea v. Lea*, 18 *N. J.* 1, 7 (1955). We think this proposition is firmly established by *Williams v. State of North Carolina* (2nd case), 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945); *Johnson v. Muelberger*, 340 *U. S.* 581, 587, 71 *S. Ct.* 474, 95 *L. Ed.* 552, 557 (1951).

The allegation of the complaint that the doubt of the appellant was created by the Mexican divorce of the respondent was without foundation in the law of this State as it stood at the time of the filing of the complaint. Whatever doubt there may have existed in the minds of some over the years that a Mexican divorce might have some validity in this State was completely dissipated when this case was filed in 1953, Docket M–1203–53. Both she and her counsel are chargeable with knowledge of the decision of this court in *Tonti v. Chadwick*, 1 *N. J.* 531 (1949), and *State v. Najjar*, 2 *N. J.* 208 (1949).

The real doubt that precipitated the filing of the complaint in this case must have been the doubt of the appellant as to the validity of her marriage to Untermann in Nevada, the legality of which in turn depended upon the validity of her divorce granted by the Nevada courts from her husband Cheney, who was alive when she married Untermann.

The Mexican divorce, if it could have any effect whatsoever, could only affect the Nevada marriage if her Nevada divorce decree was valid and entitled to full faith and credit, *not void*. Therefore, even on her theory of the case she had

the burden of proving that at the time she married Untermann she was legally in a position to enter into a valid marriage.

Since the courts of this State have the power and jurisdiction to inquire into a decree of divorce of a foreign state where there is no personal service of the defendant in that state, the testimony elicited from her on cross-examination and on the direct examination of Untermann, was relevant and material and informative to the trial court as to what the factual and legal situation was at that time. In view of her testimony we feel the Appellate Division was correct in invoking the doctrine of unclean hands and dismissing the complaint.

We are not unaware of the various criticisms of the application of this principle of equity to marital questions, but we must observe that in many instances involving a rule of law or equity it is not the rule but the application of the rule which raises the various problems. Although it is sometimes difficult theoretically to justify the court's application of the doctrine of unclean hands to a marital cause, the principles upon which the maxim rests are equitable and, if properly administered with consideration of the total situation, are instrumental in the preservation of justice and the integrity of the courts.

The method of application of the doctrine is clearly and concisely stated by Mr. Justice Trenchard in *Neubeck v. Neubeck*, 94 *N. J. Eq.* 167, at *page* 170, 27 *A. L. R.* 172 (*E. & A.* 1922), when he said:

"While the maxim, 'He who comes into equity must come with clean hands,' has a very wide application, it has also its limitations. It does not repel all sinners from courts of equity, nor does it apply to every unconscientious act or inequitable conduct on the part of the complainants. The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action, but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought. *Pendleton v. Gondolf*, 85 *N. J. Eq.* 308, and cases collected in 21 *C. J.* 182, and

10 *R. C. L.* 391. A recent illustration of the proper application of the doctrine is to be found in *Prindiville v. Johnson & Higgins*, 93 *N. J. Eq.* 425."

 The rule is not an arbitrary rule and calls for the exercise of just discretion on the part of the court. *White v. White*, 16 *N. J.* 458, 464 (1954); *Medical Fabrics Co. v. D. C. McLintock*, 12 *N. J. Super.* 177, 180 (*App. Div.* 1951).

 It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied. Facades of the problem should not be examined piecemeal. Where fraudulent conduct vitiates in important particulars the situation in respect to which judicial redress is sought, a court should not hesitate to apply the maxim.

 Justice and equity do not require an equity court to act in a factual vacuum. Equities arise and stem from facts which call for relief from the strict legal effects of given situations. A litigant should fully disclose in its pleadings the actual factual and legal situation whether the relief is sought under the general equity jurisdiction or under the Declaratory Judgment Act. It would be an anomaly if the hands of an equity court should be circumscribed by a deliberately restricted pleading which fails to disclose the true situation. Condonation by the court of such conduct would not be instrumental in the preservation of justice and the integrity of the court.

The appellant would have us declare the Mexican divorce invalid for fraud in the domicile without her disclosing that practically the same vice inheres in her Nevada decree upon which she bases her claim to a valid marriage with the respondent Untermann. In contemptuous disregard of our laws he and she conspired for her to journey to Nevada after her suits for divorce from her husband Cheney were dismissed here on her own motion, and in pursuit of a fraudulent purpose perjuriously asserted she was a *bona fide* resident of Nevada and on the basis of such representation obtained a decree.

We do not have here an innocent and naive plaintiff, the victim of a fraud practiced by her spouse, or the rights of children born of a bigamous marriage, or any other consideration which would appeal to equity and justice. There is not a scintilla of evidence indicating she had even a passing interest in the welfare of her children, aged 9 and 11 at that time.

On the other side we have a respondent who has lived in this State all his life with more than a modicum of economic success, and who is equally contemptuous of our laws and the generally accepted mores of our citizens. He was an active protagonist in the scheming designs of the appellant and had the temerity to assert rights on a patently void divorce. To say he was estopped to do so would be an understatement.

The courts below as well as this court have been told little or nothing with respect to property which may be owned by the parties and their existing rights with respect thereto, except that it can be implied that the appellant is living in the Maplewood house and the respondent may still be furnishing some support for her. There are suggestions in the record that the respondent owns other properties and business interests in this State. With proofs of such an indefinite nature as to such facts, we cannot be sure that if we undertook to declare the Nevada decree invalid under the true facts of domicile disclosed at the trial, as we constitutionally have the right to do, that we would not worsen a thoroughly bad situation and give an economic advantage to the respondent. This was probably the motivating reason for his attempted attack on the appellant's Nevada decree.

There is no mandate in the public policy of this State of which we are aware that compels the courts to act in such a case. Therefore, we have no hesitancy in concurring with the action of the Appellate Division in applying the maxim that "He who comes into equity must come with clean hands." Neither do we perceive any constitutional question in the application of the maxim in this case. *Cf. Cook v. Cook, supra,* 342 *U. S.,* at *page* 130, 72 *S. Ct.,* at *page* 160.

The final point of the appellant is that assuming the marriage of the appellant and respondent is void or voidable, a valid common law marriage came into being by virtue of their cohabitation as husband and wife after the removal of the impediment. The appellant's husband, Cheney, did not die until 1945. The appellant and respondent separated and ceased to cohabit as husband and wife in 1939 and we find no evidence of an intent to cohabit as husband and wife after the removal of the impediment, except the single disputed incident in Miami Beach in 1947. A common law marriage could only exist from and after the removal of the impediment in 1945. We find it unnecessary to discuss the applicability of *N. J. S. A.* 37:1–10. See *Dacunzo v. Edgye*, 19 *N. J.* 443 (1955).

We find no reason to disturb the award of the counsel fee made to the appellant below.

It should be noted that the respondents did not appeal from the judgment of the trial court dismissing their counterclaims on the theory that they were estopped to attack the Nevada decree, and the holding that the Mexican decree of September 28, 1953, obtained by Untermann, is not entitled to recognition in this State. Only the appellant appealed, and she appealed from that part of the judgment which held that her Nevada decree of April 15, 1929 is not entitled to full faith and credit in this State and dismissing her complaint.

Since we have concluded to leave the parties where we found them, the judgment of the trial court dismissing the complaint and counterclaims is affirmed but is modified to the extent that the part of the judgment vacating her Nevada decree of April 15, 1929 is set aside.

As modified the judgment of the Appellate Division is affirmed. No costs.

HEHER, J. (dissenting in part). I would affirm the judgment of the Appellate Division.

Plaintiff's complaint prayed, *inter alia*, for judgment fixing and determining her "marital status," and declaring that

she "is the sole and only legal wife of the defendant, John Joseph Untermann."

The validity of the ceremonial marriage to Untermann *ex necessitate* depends upon the validity of the Nevada decree of April 15, 1929, purporting to dissolve her marriage to Harold Edward Cheney, who was then living; and there could not be a determination of plaintiff's right to the relief thus sought without an adjudication of the legal sufficiency of the Nevada decree.

If the Nevada decree were valid, then the "unclean hands" doctrine would not bar a judgment establishing the validity of plaintiff's ceremonial marriage to Untermann. *E converso*, if the Nevada decree is null and void, as found, and 1 concur in the finding, plaintiff cannot have judgment establishing as valid her ceremonial marriage to Untermann and, by the same token, her complaint must be dismissed.

And we are not concerned, I would suggest, with the legal consequences as to Untermann of the resolution of the issue thus tendered by plaintiff. The clean hands doctrine has reference to a party who, as *actor*, seeks a remedy he cannot have under the principle that "He that hath committed iniquity shall not have equity," a universal rule "guiding and regulating the action of equity courts in their interposition on behalf of suitors for any and every purpose, and in their administration of any and every species of relief"; if the actor "has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." *Pomeroy's Equity Jurisprudence* (*5th ed.*) *section* 397. See *Yeiser v. Rogers*, 19 *N. J.* 284 (1955).

The judgment under review affords no relief to plaintiff; it could give none unless it found the Nevada decree valid. Nor does it give affirmative relief to Untermann, or to the counterclaimant, who has not appealed from the dismissal of her counterclaim. It dismisses plaintiff's complaint as ill-founded in law and in fact, because of the legal impedi-

522

ment to a lawful marriage between plaintiff and Untermann, a conclusion that necessarily involved the legal sufficiency of the Nevada decree.

*For modification*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*Opposed*—Justice HEHER—1.