264 N.J. Super. 17 (1993)
624 A.2d 3
BELINDA MURRAY AND ELRICK A. MURRAY, M.D., PLAINTIFFS-RESPONDENTS,
v.
MICHAEL ANDREW LAWSON, DAVID CRIST, JANE DOE (A FICTITIOUS NAME) AND JOHN DOE (A FICTITIOUS NAME), DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted February 18, 1993.
Decided April 12, 1993.
*21 Before Judges KING, BRODY and LANDAU.
Richard F. Collier, Jr., attorney for appellants (Mr. Collier, on the brief).
Pamela Mandel, attorney for respondents (Ms. Mandel, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
In this case plaintiffs sought damages and injunctive relief against defendants for picketing in an harassing manner in front of their home in Westfield on January 20, 1991. Plaintiff Elrick A. Murray, M.D., is a physician who performs abortions. Defendants are anti-abortionists. The Chancery Division judge dismissed the damages claim but entered a permanent injunction against pickets or demonstrations by defendants and their cohorts within 300 feet of plaintiffs' residence. Defendants appeal from the injunctive order. We affirm.

I
The verified complaint filed in February 1991 by Dr. Murray and his wife against Michael Andrew Lawson, David Crist, and the fictitiously-named defendants, alleged: (1) trespass, (2) disruption of use and enjoyment of property, (3) intrusion on seclusion, (4) damage to Dr. Murray's professional reputation and pecuniary interests, and (5) deprivation of the right to privacy guaranteed by the federal and State constitutions. After a hearing on February 14, 1991 Judge Boyle entered a temporary order sharply restricting picketing near plaintiffs' home.[1] Defendants removed the case *22 to federal court on February 26, 1991. Federal Judge Barry returned the matter to State court because of lack of federal jurisdiction. We then denied defendants' request for interlocutory review on April 26, 1991.
Judge Boyle held a final hearing on May 21, 31 and July 25, 1991. He dismissed the damages claims but on July 26, 1991 permanently enjoined picketing within 300 feet of plaintiffs' residence.

II
The final hearing presented this factual picture. Dr. Murray is an obstetrician and gynecologist with a private practice in Plainfield. He also serves at several area clinics, including the Women's Medical Center in Howell, where he and other doctors perform abortions. He does not perform abortions at his Plainfield office. He lives in a typical suburban residential neighborhood in Westfield. He maintains no office and treats no patients there. He lives there with his wife, plaintiff Belinda Murray, and three children, who in 1991 were age six, eleven and fifteen. *23 Defendants, who live near the Howell Clinic, regularly demonstrated against abortion by picketing at the Howell Clinic for about two years before January 1991.
Defendant Lawson discovered the Plainfield and Westfield addresses of Dr. Murray. He visited the Westfield home address on about December 14, 1990 and was surprised to see a residence rather than an office. He rang the doorbell, which was answered by plaintiffs' son, then age fourteen, and on confirming it was the Murray residence, told the lad to tell his father to stop doing abortions. Mrs. Murray then appeared at the door and told Lawson not to talk to her children, to leave and not to come back. He immediately left. Mrs. Murray was upset and frightened by this visit.
Defendants then planned a demonstration at the Murray residence for January 20, 1991, a Sunday. On January 18 Lawson informed the Westfield police that a peaceful protest picket was planned by about fifty people. In the afternoon of January 20 two policemen met the fifty-seven picketers at the nearby Edison School, instructed them on basic picketing rules, and escorted them to the sidewalk in front of plaintiffs' house and about ten surrounding homes. They walked in a single-file loop on the sidewalk past plaintiffs' house, usually two abreast but sometimes four or five abreast.
Dr. Murray had been warned of the impending demonstration by the administrator of the Medical Care Center in Woodbridge, another clinic where he served. Westfield police had confirmed this and advised Dr. Murray to send his family away for the day and remain inside the house himself. Mrs. Murray and the children spent the day at her sister's home. Dr. Murray observed the pickets from his windows. He heard singing, shouting and chanting; he saw several neighbors, including two teenage boys, converse with the picketers. One of the boys videotaped a short portion, in which picketers loudly questioned whether the boy knew there was a killer in the neighborhood. Picketers carried placards describing Dr. Murray as: a vagabond abortionist, a *24 killer of unborn babies who scars women, and a child murderer. One sign stated that if Dr. Murray got out of Howell, the picketers would get out of Westfield. Another placard showed a decapitated infant labeled "Elrick Murray, abortionist."
The plaintiffs said the demonstration deprived them of their usual Sunday family time and threatened Dr. Murray's practice by forcing him to remain home out of fear for his property while two of his patients were in labor. Since the picketing, Mrs. Murray has been nervous and depressed; Dr. Murray has felt compelled to curtail his professional work so he can be at home more often.
In response to the January 20 demonstration, plaintiffs filed this suit. On the day of the first scheduled hearing date, February 8, defendants Lawson and Crist picketed on the sidewalk in front of plaintiffs' residence, and along the block, for about fifteen minutes.
On February 26 defendants removed the case to federal district court based on the assertion of a federal constitutional claim of deprivation of privacy rights. After several motions in that court, Federal Judge Barry remanded to State court for lack of federal jurisdiction on April 24, 1991. Jurisdiction was declined when Judge Barry dismissed that portion of count five alleging violation of a right to privacy guaranteed by the United States Constitution because the requisite state action was absent. She found that, because of Fed.R.Civ.P. 65(b), Judge Boyle's temporary restraining order had expired on March 12, 1991, ten days after the February 26 removal. On April 26, 1991 Judge Boyle reimposed the earlier temporary restraints.
There was no further residential picketing until May 4, 1991. In the interim, Dr. Murray's apprehension about the conduct of anti-abortionists heightened. On April 22 Dr. Murray discovered, on arriving at work at the Medical Care Center in Woodbridge, that the building had been burned. The police chief and fire marshal attributed the fire to arson. Sometime between April 22 and May 4 Lawson picketed at the Howell clinic, and later that same day picketed at Dr. Murray's Plainfield office. On May 2 *25 the Howell police received a telephone bomb threat to the Howell clinic.
On the morning of May 4 Lawson and Edith Tucker began to picket in front of plaintiffs' home. Dr. Murray was annoyed by the timing, both because this came on the heels of the Woodbridge clinic arson and because he had misinterpreted the preliminary injunction to mean that defendants could picket only the third week of every month, as opposed to every three weeks. He called the police, who reminded him of the injunction permitting such picketing and came to the scene. After the police arrived, Dr. Murray went out to confront Lawson, expressed certain "expletives," and asked why he was there. Lawson replied that he would continue to come to the doctor's home as long as the doctor continued to go to the Howell clinic.
According to Dr. Murray, he returned to his house at the urging of police, who told him shortly afterwards that the picketers' hour was up. This was in error; the picketers actually had a few minutes left before their hour was up. Dr. Murray rushed out and "took a swing" at Lawson, but a police officer reacted quickly to intercept it. Dr. Murray and a neighbor also attempted to remove a sign strapped to Tucker. Although Dr. Murray had no proof linking defendants with the arson or bomb threat, he was scared by those events; he found defendants' presence threatening, and feared the demonstrators and their colleagues.
According to Lawson, Dr. Murray talked to him for about ten minutes before the police arrived, and also yelled, cursed and told him to leave. He grabbed and tore Lawson's "Stop Abortion Now" sign. After police arrived, one officer ushered Dr. Murray away from the picketers. When Dr. Murray returned to the sidewalk accompanied by an officer, Lawson felt a punch to the back of his head. After picketing a bit longer, Lawson told the police that he wanted Dr. Murray arrested, and was advised to file a complaint. He later did so and Dr. Murray was convicted of simple assault in the Westfield Municipal Court and fined $100.
*26 At the conclusion of the February 14, 1991 plenary hearing, Judge Boyle enjoined defendants from picketing within 300 feet of plaintiffs' residence. He dismissed the claim for interference with Dr. Murray's profession, which he interpreted as a claim for interference with contractual relations, based on lack of evidence of the required malice or intent. He subsumed the claim for interference with use and enjoyment of the home under the claim for tortious invasion of privacy. He found the December 14, 1990 trespass by defendant Lawson to have occurred "before this case was instituted," presumably meaning that it was not relevant to the picketing. He characterized plaintiffs' common-law tort claims as an invasion of privacy and intentional infliction of emotional distress. He found insufficient evidence to justify money damages for either. Plaintiffs do not cross-appeal from these adjudications.
Judge Boyle found that plaintiffs had a privacy interest in their home, independent of any tort claim, and that a court of equity could intervene to protect that right even if no legal remedy for tort damages was available. He engaged in a balancing test between plaintiffs' privacy interest and defendants' First Amendment rights. He found that under Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), targeted or focused residential picketing was subject to judicial regulation, even absent trespass or disturbance of the peace. He found the Frisby analysis appropriate even though in that case an ordinance, rather than an injunction, was challenged and upheld.
The judge dissolved the prior temporary injunction and ordered "that the defendants and all persons in active concert or participation with them be enjoined and restrained from picketing in any form including parking, parading or demonstrating in any manner, within 300 feet of the Murray residence at ... Westfield, New Jersey...."
Defendants contend on this appeal that the injunction: (1) violates the separation of powers doctrine, (2) was an unconstitutional prior restraint, (3) violated defendants' free speech rights, *27 and (4) was unwarranted because Dr. Murray came to the court of equity with "unclean hands."

III
Defendants first contend that the judge had no power to issue an injunction absent a finding that they had committed a crime or tort. Plaintiffs respond that the judge had inherent equitable power to enforce a right to residential privacy as recognized by the United States Supreme Court in Frisby, supra, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420. We agree with plaintiffs.
Substantive law-making belongs in the legislative domain, State v. Leonardis, 73 N.J. 360, 369, 374, 375 A.2d 607 (1977), and the judicial branch of government is constitutionally prohibited from exercising powers properly belonging to another branch. N.J. Const. art. III, ¶ 1.[2] Under their concept of the doctrine of separation of powers, defendants assert that no legal right worthy of judicial protection was established and that there can be no equitable remedy without proof of "legal liability."
The irreparable harm necessary for equitable relief frequently is identified by the inadequacy of money damages. Crowe v. De Gioia, 90 N.J. 126, 133, 447 A.2d 173 (1982). Nonetheless, defendants insist that their peaceful, residentially-focused picketing cannot be enjoined because they violated no positive laws and committed no civil wrongs and because the court of equity lacks power to enjoin conduct subject to neither criminal nor civil penalty. We reject this as too crabbed a view of the scope of equitable relief in this circumstance.
*28 Equity follows the law, and ordinarily equity will not divest legal rights. Dunkin' Donuts of America, Inc. v. Middletown Donut Corp., 100 N.J. 166, 183-84, 495 A.2d 66 (1985). However, equity is sometimes obliged to acknowledge rights not recognized at law, and "equity will never suffer a wrong without a remedy." Orland Properties, Inc. v. Broderick, 94 N.J. Super. 307, 313-14, 228 A.2d 95 (Ch.Div. 1967).
Defendants contend not only that plaintiffs had no protectable right, but also that any remedy in favor of plaintiffs deprives them of their constitutional right to free expression. Defendants also rely on the Supremacy Clause, contending that First Amendment rights must perforce outweigh any State constitutional right to privacy asserted by plaintiffs. We agree that the validity of the injunction depends on the balancing of First Amendment considerations.
We perceive no separation of powers problem here arising from the Chancery judge's exercise of inherent equitable power. Contrary to defendants' contention, Judge Boyle did not "roam around righting `wrongs' at will," but granted equitable relief to vindicate a right to residential privacy in a context explicitly recognized by the United States Supreme Court in Frisby, supra, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420.
In Frisby, Justice O'Connor described a right to avoid being an unwilling, or "captive" listener in one's own home. Id. at 484-85, 108 S.Ct. at 2502, 101 L.Ed.2d at 431-32. The right is not described by her as a constitutional right to be protected against state action only, but as a personal right to residential privacy in whose protection there is a significant governmental interest. Ibid. Based on the right to residential privacy described in Frisby, we recently upheld restraints against peaceful union picketing at the residence of the president of a corporation. K-T Marine, Inc. v. Dockbuilders Local Union 1456, 251 N.J. Super. 153, 597 A.2d 563 (Ch.Div. 1990), aff'd, 251 N.J. Super. 107, 597 A.2d 540 (App.Div. 1991). The president-homeowner did not allege trespass or disruptive behavior; he only alleged that his family *29 was made apprehensive. The Third Circuit also recently upheld restraints based on so-called Frisby rights, enjoining picketing within 500 feet of the residence of an abortion clinic employee. Northeast Women's Ctr., Inc. v. McMonagle, 939 F.2d 57, 65 (3d Cir.1991). The restriction on home picketing was found reasonable in light of prior demonstrations considered harassment by the court, which had resulted in resignations of two intimidated employees, a blocked driveway preventing an employee from going to work, and frightened children. That injunction restrained not only harassment or trespass, but all picketing at employees' homes, even peaceful, otherwise legal, picketing.
In Frisby, the United States Supreme Court upheld a Bloomfield, Wisconsin ordinance that banned picketing "before or about" any residence. The Court construed "the ban to be a limited one; only focused picketing taking place solely in front of a particular residence is prohibited." 487 U.S. at 483, 108 S.Ct. at 2502, 101 L.Ed.2d at 431. The Court relied on the exercise of the general police power by state and local government rather than on any federal constitutional right to privacy. The Court found that the enforcement of the Brookfield, Wisconsin ordinance preserved ample alternative channels of communication to the anti-abortion activities while it served "a significant government interest": "the protection of residential privacy." Id. at 484, 108 S.Ct. at 2502, 101 L.Ed.2d at 431.
Defendants urge us to hold, under the guise of obeisance to the doctrine of separation of powers, that only a municipal ordinance, or some form of positive law, can protect this right of residential privacy  that a court of equity has no such power absent a local ordinance. Defendants urge that if a court of equity so acts in the absence of a local ordinance, it becomes akin to the odious court of Star Chamber or the Inquisition. We reject the contention.
We conclude that a court of equity has inherent power to protect this significant right to residential privacy, under either State or federal concepts of the police power, even in the absence of a local ordinance. Justice O'Connor reviewed at length the *30 judicial history of the protection of residential privacy in Frisby and we burden this opinion with her very pertinent observations:
"The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Carey v. Brown, 447 U.S. [455] at 471, 65 L.Ed.2d 263, 100 S.Ct. 2286 [2296 (1980)]. Our prior decisions have often remarked on the unique nature of the home, "the last citadel of the tired, the weary, and the sick," Gregory v. Chicago, 394 U.S. 111, 125, 22 L.Ed.2d 134, 89 S.Ct. 946 [953] (1969) (Black, J., concurring), and have recognized that "[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." Carey, supra, [447 U.S.] at 471, 65 L.Ed.2d 263, 100 S.Ct. 2286 [2296].
One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, cf., Erznoznik v. City of Jacksonville, supra, [422 U.S. 205] at 210-211, 45 L.Ed.2d 125, 95 S.Ct. 2268 [2273 (1975)]; Cohen v. California, 403 U.S. 15, 21-22, 29 L.Ed.2d 284, 91 S.Ct. 1780 [1786] (1971), the home is different. "That we are often `captives' outside the sanctuary of the home and subject to objectionable speech ... does not mean we must be captives everywhere." Rowan v. Post Office Dept, 397 U.S. 728, 738, 25 L.Ed.2d 736, 90 S.Ct. 1484 [1491] (1970). Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom. [487 U.S. at 484-85, 108 S.Ct. at 2502, 101 L.Ed.2d at 431-32.]
* * * * * * * *
Here, in contrast, the picketing is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt.... [487 U.S. at 486, 108 S.Ct. at 2503, 101 L.Ed.2d at 433.]
As Justice O'Connor observed, "The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech." Id. at 487, 108 S.Ct. at 2504, 101 L.Ed.2d at 433.
We also stress on this point that our State Supreme Court has recognized a State constitutional right of privacy under Article I, *31 paragraph 1 of the New Jersey Constitution.[3]Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 95-96, 609 A.2d 11 (1992). This right has been recognized in many contexts, including: marital and familial association, refusal of medical treatment, consensual adult sexual relations, disclosure of personal information, and procreative rights. Id. at 96, 609 A.2d 11. See Robert F. Williams, The New Jersey State Constitution 30-31 (1990). The right to residential privacy is similarly inherent in human concerns. The State right to privacy has been called the common-law right to solitude or seclusion in private affairs. Hennessey, supra, 129 N.J. at 94-95, 609 A.2d 11. We reject the notion that courts are powerless to protect residential privacy simply because there is no local ordinance regulating focused or targeted residential picketing. "It has been recognized that the State Constitution, as a well spring of individual rights and liberties, may be directly enforceable, its protections not dependent even upon implementing legislation." State v. Schmid, 84 N.J. 535, 559, 423 A.2d 615 (1980), appeal dismissed, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). We uphold the power of the court of equity to act in these circumstances.

IV
We next consider defendants' claim that the injunction is both a prior or unreasonable restraint in violation of their First Amendment rights of speech and expression. Plaintiffs claim that the injunction is a valid restraint because it: (1) is a content-neutral time, place and manner restriction, (2) is narrowly tailored to serve a significant governmental interest, and (3) leaves open ample alternative channels of communication. We agree with plaintiffs.
*32 The First Amendment to the United States Constitution provides in relevant part, "Congress shall make no law ... abridging the freedom of speech...." Picketing plainly involves expressive conduct within its protection. Police Dep't v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212, 218 (1972); Pebble Brook, Inc. v. Smith, 140 N.J. Super. 273, 276, 356 A.2d 48 (Ch.Div. 1976).
Public streets and sidewalks in residential neighborhoods are a traditional public forum. Carey v. Brown, 447 U.S. 455, 460, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263, 269 (1980). In a public forum, government restrictions on speech-related activity such as picketing are subject to careful scrutiny. Id. at 461-62, 100 S.Ct. at 2291, 65 L.Ed.2d at 270. This contrasts with non-public fora, where speech restrictions must satisfy only a reasonableness standard. International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S., ___, ___, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541, 550 (1992).
Under the First Amendment, applicable to states through the Fourteenth Amendment, government may not prohibit all communicative activity in a public forum. Horizon Health Center v. Felicissimo, 263 N.J. Super. 200, 622 A.2d 891 (App.Div. 1993); see Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 804 (1983). Content-based restrictions are permitted only where necessary to serve a compelling state interest and where narrowly drawn to achieve that end. Ibid. Content-neutral regulations of time, place and manner of expression are permitted only if they are narrowly tailored to serve a significant government interest and if they leave open ample alternative channels of communication. Ibid.
Hence, peaceful picketing is protected by the First Amendment. Thornhill v. Alabama, 310 U.S. 88, 104, 60 S.Ct. 736, 745, 84 L.Ed. 1093, 1103 (1940). However, peaceful residential picketing is not "beyond the reach of uniform and nondiscriminatory regulation." Carey v. Brown, supra, 447 U.S. at 470, 100 S.Ct. at 2295, 65 *33 L.Ed.2d at 275. Moreover, as we have seen, the state may regulate "to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected ... for homes...." Id. at 470-71, 100 S.Ct. at 2295, 65 L.Ed.2d at 276 (quoting Gregory v. Chicago, 394 U.S. 111, 118, 89 S.Ct. 946, 950, 22 L.Ed.2d 134, 140 (1969) (Black, J., concurring)). As discussed in point III, the United States Supreme Court, in Frisby, found valid a Brookfield, Wisconsin ordinance banning all residential picketing. The ordinance stated: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." Frisby, supra, 487 U.S. at 477, 108 S.Ct. at 2498, 101 L.Ed.2d at 426-27. The ordinance was enacted in response to peaceful picketing at the home of a doctor who performed abortions at clinics in neighboring towns. The Court construed the ordinance to prohibit not all picketing in residential areas, but only picketing focused on and taking place in front of a particular residence, thus preserving ample alternative channels of communication, even within the same residential neighborhood. Id. at 482-84, 108 S.Ct. at 2501-02, 101 L.Ed.2d at 430-31.
The Court found the ordinance narrowly tailored to protect unwilling recipients of the communications because it targeted no more than the problem it sought to remedy. Id. at 485, 108 S.Ct. at 2502, 101 L.Ed.2d at 432. The ordinance banned picketing directed not to the public, but to a specific household, and the ban of the resulting intrusion was permissible even if the picketers had a broader communicative purpose. Id. at 486, 108 S.Ct. at 2503, 101 L.Ed.2d at 433. The Court found picketing outside a residence, whatever the size of the group, unquestionably offensive and disturbing. Id. at 487, 108 S.Ct. at 2504, 101 L.Ed.2d at 433. The problem, the unavoidable presence of an unwelcome visitor at the home, is created by the medium of expression itself, the picketing. Ibid. 487 U.S. at 488, 108 S.Ct. at 2505, 101 L.Ed.2d at 434.
The injunction in the case before us must be subjected to the same analysis. The injunction here is facially content-neutral. *34 Nevertheless, an injunction is necessarily directed to a particular class of speakers. Defendants argue it is therefore both content-specific and viewpoint-specific. The Third Circuit recently rejected this argument, explaining that limitation of the restraint to those who had already picketed did not create a focus on content, but rather reflected a tailoring of the remedy to its legitimate purpose. Northeast Women's Ctr., Inc. v. McMonagle, supra, 939 F.2d 57; Id. at 62-63, 66. We agree. Horizon Health Center, supra, 263 N.J. Super. at 214, 622 A.2d 891.
Content-based or viewpoint restrictions on speech are presumptively invalid. R.A.V. v. City of St. Paul, 505 U.S. ___, ___, 112 S.Ct. 2538, 2542-43, 120 L.Ed.2d 305, 317 (1992). They are almost always impermissible in a public forum. Police Dep't v. Mosley, supra, 408 U.S. at 96, 92 S.Ct. at 2290, 33 L.Ed.2d at 217. Residential privacy is not such a compelling interest that it will permit content-based restrictions. Carey v. Brown, supra, 447 U.S. at 465, 100 S.Ct. at 2292, 65 L.Ed.2d at 272. However, incidentally differential treatment of speech based on content is permitted where the injunctive relief targets conduct based on an activity other than its expressive content. R.A.V. v. City of St. Paul, supra, 505 U.S. at ___, 112 S.Ct. at 2546-47, 120 L.Ed.2d at 321-22.
A Texas appellate court recently relied on Frisby when concluding that an injunction, which prohibited picketing within 400 feet of a physician's residence by anti-abortion protestors, conformed to First Amendment standards. Valenzuela v. Aquino, 800 S.W.2d 301 (Tex. Ct. App. 1990), error granted, May 1, 1991. The Texas court found no violation of the content-neutrality requirement because the injunction was directed to and proscribed the secondary effects of the picketing, not the content of the speech. Id. at 305. The court noted that a regulation may satisfy content-neutral review standards, despite a discriminatory impact on content, as long as its purpose was content-neutral. Ibid. (citing City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 48-49, 106 S.Ct. 925, 89 L.Ed.2d 29, 38-39 (1986) (prohibition of adult movie *35 theaters within 1,000 feet of residential property held content-neutral where purpose to protect residences from secondary effects of such theaters)); see Medlin v. Palmer, 874 F.2d 1085, 1090 (5th Cir.1989) (ordinance prohibiting loudspeaker within 150 feet of abortion clinic held content-neutral despite practical effect of limiting publication of anti-abortionists' speech). Other recent cases upholding injunctions restricting picketing of a doctor's residence include Dayton Women's Health Ctr. v. Enix, 68 Ohio App.3d 579, 589 N.E.2d 121, 124, 127 (1991), appeal dismissed, 62 Ohio St.3d 1500, 583 N.E.2d 971 (Ohio), cert. denied, ___ U.S. ___, 112 S.Ct. 3033, 120 L.Ed.2d 903 (1992) (the court, relying on Frisby, rejected a First Amendment challenge to an injunction banning picketing at or within viewing distance of the homes of patients, employees, staff or volunteers of an abortion clinic) and Klebanoff v. McMonagle, 380 Pa.Super. 545, 552 A.2d 677 (1988), appeal denied, 522 Pa. 620, 563 A.2d 888 (1989) (the court, also relying on Frisby, upheld an injunction banning pro-life movement members from demonstrating outside the home of an abortion doctor). No local ordinance or state statute against focused or targeted picketing was involved in these Ohio, Texas and Pennsylvania cases.
In our view, the injunction here is content-neutral in intent, and a proper regulation because there is a significant government interest at stake, despite the 300-foot restriction on expression of a particular viewpoint. To hold otherwise would limit injunctive relief of residential picketing to circumstances of "compelling" state interest only, a higher burden not met here. Since the injunction here is content-neutral, the higher standard need not be met. Moreover, neither the United States Supreme Court, nor our Supreme Court, have ever suggested that regulation of protected speech by injunction, rather than by legislation, must be judged under a different, stricter standard. The effect here may be to disallow in this particular location, the vicinity of Dr. Murray's home, anti-abortion picketing only, but that is the effect of defendants' viewpoint, not any intent to censor on the part of the State.
*36 As in Frisby, a restriction by location only, here prohibiting pickets within 300 feet of plaintiffs' home, clearly preserves ample alternative channels of communication both at the clinics where Dr. Murray performs abortions, at his office, and even generally within his own residential neighborhood or community. Finally, the ban is narrowly tailored because the problem to be remedied, intrusion into residential tranquility, is created by the picketing itself. And it properly binds only noticed parties, their agents, and those acting in concert with them. R. 4:52-4.
We agree with defendants that any coercive or intimidating intent on their part can in no way limit their right to free expression. Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1, 5 (1971). However, the coercive or intimidating effects of the picketing may be considered in tailoring restraints that fall within First Amendment limitations, because those effects constitute part of the residential intrusion, the significant governmental interest at stake.
Contrary to defendants' contention, we find that Judge Boyle did not focus on the effect of the content of the picketers' message on listeners, and therefore impermissibly on the content itself. Boos v. Barry, 485 U.S. 312, 321, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333, 344-45 (1988). In contrast, we find he focused on the intimidating effect of the bodily presence of picketers on the residents of the home.

V
Finally, defendants contend that equitable relief is precluded by plaintiffs' "unclean hands," because Dr. Murray's assault on Lawson and both plaintiffs' hostile remarks to picketers should result in forfeit of any claim to relief plaintiffs might otherwise have. Use of the unclean hands doctrine is within the court's just discretion. Untermann v. Untermann, 19 N.J. 507, 518, 117 A.2d 599 (1955). We review the judge's decision only for abuse of discretion, unless there was a misapplication of law. Kavanaugh v. Quigley, 63 N.J. Super. 153, 158, 164 A.2d 179 (App.Div. 1960).
*37 The doctrine of unclean hands expresses the principle that a court should not grant equitable relief to one who is a wrongdoer with respect to the subject matter of the suit. Faustin v. Lewis, 85 N.J. 507, 511, 427 A.2d 1105 (1981). It calls for the exercise of just discretion in denying remedies where the suitor is guilty of bad faith, fraud or unconscionable acts in the underlying transaction. Untermann, supra, 19 N.J. at 517-18, 117 A.2d 599. However, the doctrine "does not repel all sinners from courts of equity, nor does it apply to every unconscientious act or inequitable conduct" of a complainant. Goodwin Motor Corp. v. Mercedes-Benz of North Am., Inc., 172 N.J. Super. 263, 271, 411 A.2d 1144 (App.Div. 1980) (quoting Neubeck v. Neubeck, 94 N.J. Eq. 167, 170, 119 A. 26 (E. & A. 1922)). The doctrine may be relaxed in the interest of fairness. Johnson v. Johnson, 212 N.J. Super. 368, 384, 515 A.2d 255 (Ch.Div. 1986).
The bad conduct here alleged is plaintiffs' hostile behavior toward defendants during the picketing on May 4, 1991, which defendants claim demonstrated plaintiffs' desire to quell their right to free expression. Defendants argue that plaintiffs' angry remarks and Dr. Murray's assault on Lawson, for which he was convicted and fined in municipal court, should not be rewarded.
Plaintiffs do not respond specifically to this argument in their brief, but their counsel argued at trial that the April 22 fire at the Woodbridge clinic, and the May 2 bomb threat at the Howell clinic, though presumably attributable to other anti-abortionists, and not to defendants, made Dr. Murray "edgy" on May 4. Counsel also argued that the timing of Lawson's unprecedented picketing of Dr. Murray's Plainfield office shortly after the Woodbridge fire, and the surprise of the May 4 picket after more than a two-month picketing hiatus, made plaintiffs' fear, anger, and hostile conduct understandable.
No fraud or unconscionable act is alleged. The issue is whether plaintiffs' admittedly improper self-help response to the May 4 picketers constituted a level of bad faith sufficient to preclude an equitable remedy. In our view, it did not. Defendants' argument *38 that the bad acts demonstrate plaintiffs' malevolent intent to destroy their First Amendment rights does not resolve the question of the scope of those rights. Plaintiffs' transgressions themselves are not so egregious as to compel forfeiture of relief. Their outrage was fueled by other events which, though unrelated to these defendants, heightened the perceived threat. Also, Dr. Murray's assault was punished in the appropriate forum, municipal court.
A judge's discretionary decision not to invoke the unclean hands doctrine is justified where the conduct was "not the kind of conduct which a court must punish in order to vindicate its authority." Schwartzman v. Schwartzman, 248 N.J. Super. 73, 79-80, 590 A.2d 246 (App.Div.), certif. denied, 126 N.J. 341, 598 A.2d 897 (1991). Judge Boyle ruled that Dr. Murray's admitted "swing" at Lawson reflected the emotionally charged issues involved and that he would focus on balancing the rights of the parties, not on the misguided assault. In our view he did not abuse his discretion or misapply the law in so deciding.
Affirmed.
NOTES
[1] The temporary order of February 22, 1991 stated:

ORDERED that the defendants and all persons and organizations associated with or acting in concert or combinations with them be enjoined and restrained from using the word killer or murderer or from referring to Dr. Murray and members of his family by name. This restriction applies to both the spoken and the written word; and it is further [ordered:]
1. Defendant may picket for not more than one (1) hour every third week commencing the week of February 18, 1991. There is to be no picketing until that time;
2. That no more than two (2) demonstrators may be present at the plaintiffs' residence until further Order of the Court.
3. Should any additional demonstrators be present in the adjacent area to the plaintiffs' residence, they may not congregate near the plaintiffs' house but must walk throughout the entire neighborhood to include at least the distance to Central Avenue;
4. The sign which was present on January 20, 1991 of the decapitated person which purported to be a fetus is prohibited and it is further
ORDERED that the defendants and all persons and organizations associated with or acting in concert or combination with them be enjoined and restrained from hand delivering written material to the plaintiffs or their neighbors....
[2] N.J. Const. art. III, ¶ 1 states:

The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
[3] N.J. Const. art. I, ¶ 1 states: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."